IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

   - against -

JEFFREY STEIN, JOHN LANNING, RICHARD
SMITH, JEFFREY EISCHEID, PHILIP WIESNER,
JOHN LARSON, ROBERT PFAFF, DAVID AMIR
MAKOV, LARRY DELAP, STEVEN GREMMINGER,
RAYMOND J. RUBLE, also known as "R.J. Ruble,"
GREGG RITCHIE, RANDY BICKHAM, MARK
WATSON, CAROL WARLEY, DAVID RIVKIN, CARL
HASTING, RICHARD ROSENTHAL, and DAVID
GREENBERG,

                    Defendants.

S1 05 Crim. 0888 (LAK)

Judge Lewis A. Kaplan

**DEFENDANT JOHN LANNING'S MEMORANDUM OF LAW IN SUPPORT OF HIS
MOTION TO DISMISS THE INDICTMENT OR, IN THE ALTERNATIVE, FOR
SEVERANCE, TO STRIKE, FOR PARTICULARS AND TO REQUIRE THE
<u>PRESERVATION OF GOVERNMENT AGENTS' NOTES</u>**

**AKIN GUMP STRAUSS HAUER & FELD LLP**

Michael J. Madigan
Robert H. Hotz, Jr.
Christopher T. Schulten
590 Madison Avenue
New York, New York 10022
(212) 872-1000

*Attorneys for Defendant John Lanning*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

ARGUMENT ................................................................................................................. 5

I.   THE CHARGES AGAINST LANNING MUST BE DISMISSED FOR FAILURE TO STATE AN OFFENSE ...................................................................................... 5

    A.   Elements of the Offenses ............................................................................ 5

    B.   Willfulness Cannot Be Shown Here as a Matter of Law ................................ 7

    C.   The Tax Shelters Complied With The Code and the Cases Thereunder .......... 8

        1.   FLIP and OPIS ................................................................................. 9

        2.   BLIPS and SOS ............................................................................. 10

    D.   Under *Cheek* and *Pirro*, the Indictment Must Be Dismissed.................. 12

II.   THE INDICTMENT VIOLATES THE DUE PROCESS REQUIREMENT OF FAIR WARNING ................................................................................................... 13

III.   COUNTS TWO THROUGH FORTY MUST BE DISMISSED BECAUSE THEY DO NOT PLEAD SPECIFIC FACTS AS TO LANNING ........................................... 15

IV.   SEVERANCE IS REQUIRED ....................................................................... 17

    A.   Lanning Is Improperly Joined Under Rule 8(b)........................................ 17

    B.   Severance Is Also Warranted Pursuant To Rule 14 .................................. 19

        1.   Applying the *Casamento* analysis, this "mega-trial" should be severed .... 20

        2.   Even if the Court does not apply the special *Casamento* procedures for "mega-trials," severance is still warranted under applicable case law ................ 22

V.   PARAGRAPHS 59 THROUGH 63 OF THE INDICTMENT SHOULD BE STRICKEN BECAUSE THEY ARE IRRELEVANT TO THE CRIMES CHARGED AND ARE HIGHLY PREJUDICIAL ................................................................. 23

VI.   THE COURT SHOULD DIRECT THE GOVERNMENT TO SUPPLY A BILL OF PARTICULARS ........................................................................................... 25

VII.   THIS COURT SHOULD INSTRUCT THE GOVERNMENT TO PRESERVE AGENTS' NOTES ....................................................................................... 28

CONCLUSION .......................................................................................................... 29

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Cheek v. United States*
    498 U.S. 192, 111 S. Ct. 604 (1991) ...............................................6, 7, 12, 14

*City of Chicago v. Morales*
    527 U.S. 41, 119 S. Ct. 1849 (1999) ..........................................................13

*Commissioner v. Banks*
    543 U.S. 426, 125 S. Ct. 826 (2005) ..........................................................11

*Helmer v. Commissioner*
    T.C. Memo 1975-160, 1975 WL 2787 (1975) .......................................11, 12

*Hillman v. IRS*
    250 F.3d 228 (4th Cir. 2001) ....................................................................11

*LaRue v. Commissioner*
    90 T.C. 465 (1988) ....................................................................................11

*Long v. Commissioner*
    71 T.C. 1 (1978) ........................................................................................11

*Russell v. United States*
    369 U.S. 749, 82 S. Ct. 1038 (1962) ..........................................................16

*Salina Partnership LP v. Commissioner*
    T.C. Memo 2000-352, 2000 WL 1700928 (2000) .......................................12

*Speltz v. Commissioner*
    124 T.C. 165 (2005) ..................................................................................11

*Spies v. United States*
    317 U.S. 492, 63 S. Ct. 364 (1943) ............................................................16

*United States v. Barnes*
    158 F.3d 662 (2d Cir. 1998) .....................................................................26

*United States v. Bellomo*
    954 F. Supp. 630 (S.D.N.Y. 1997) ...........................................................20

*United States v. Bortnovsky*
    820 F.2d 572 (2d Cir. 1987) ................................................................26, 27

*United States v. Casamento*
    887 F.2d 1141 (2d Cir. 1989) ........................................................................20, 21, 22

*United States v. Cordero*
    No. 97-CR-63, 1998 WL 160819 (N.D.N.Y. 1998)....................................................28

*United States v. Dahlstrom*
    713 F.2d 1423 (9th Cir. 1983)................................................................................6, 7

*United States v. Davidoff*
    845 F.2d 1151 (2d Cir. 1988) ......................................................................................27

*United States v. Feola*
    651 F. Supp. 1068 (S.D.N.Y. 1987) .....................................................................27, 28

*United States v. Gallo*
    668 F. Supp. 736 (E.D.N.Y. 1987) ..............................................................................23

*United States v. Gatien*
    No. 96 Cr. 430, 1997 WL 661138 (E.D.N.Y. Oct. 20, 1997) ......................................23

*United States v. Gotti*
    42 F. Supp. 2d 252 (S.D.N.Y. 1999) ...........................................................................24

*United States v. Grunewald*
    353 U.S. 391, 77 S. Ct. 963 (1957).............................................................................24

*United States v. Gullo*
    672 F. Supp. 99 (W.D.N.Y. 1987) ...............................................................................28

*United States v. Hamilton*
    334 F.3d 170 (2d Cir. 2003) ..........................................................................................6

*United States v. Harding*
    273 F. Supp. 2d 411 (S.D.N.Y. 2003) ...................................................................26, 27

*United States v. Harris*
    942 F.2d 1125 (7th Cir. 1991) ......................................................................................7

*United States v. Helmsley*
    941 F.2d 71 (2d Cir. 1991) ......................................................................................5, 16

*United States v. Hernandez*
    85 F.3d 1023 (2d Cir. 1996) ........................................................................................24

*United States v. Klausner*
    80 F.3d 55 (2d Cir. 1997) ................................................................5, 6, 16

*United States v. Klein*
    247 F.2d 908 (2d Cir. 1957) ...............................................................5, 6

*United States v. Lanier*
    520 U.S. 259, 117 S. Ct. 1219 (1997) ..................................................13, 14

*United States v. Lino*
    No. 00 CR. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Dec. 29, 2000) ...........................27

*United States v. Marcus Schloss & Co., Inc.*
    710 F. Supp. 944 (S.D.N.Y. 1989) ................................................................24

*United States v. Mallas*
    762 F.2d 361 (4th Cir. 1985) ...............................................................7, 13

*United States v. Miller*
    26 F. Supp. 2d 415 (N.D.N.Y. 1998) ................................................................24

*United States v. Mulder*
    273 F.3d 91 (2d Cir. 2001) ................................................................24

*United States v. Nachamie*
    91 F. Supp. 2d 565 (S.D.N.Y. 2000) ................................................................27, 28

*United States v. Nunez*
    No. 00-CR-121, 2001 WL 91708 (S.D.N.Y. Feb. 1, 2001)................................................28

*United States v. Pipola*
    83 F.3d 556 (2d Cir. 1996) ................................................................6

*United States v. Pirro*
    76 F. Supp. 2d 478 (S.D.N.Y. 1999) ...............................................................17, 18

*United States v. Pirro*
    212 F.3d 86 (2d Cir. 2000) .........................................................5, 6, 7, 8, 12, 13, 15

*United States v. Ramos*
    346 F. Supp. 2d 567 (S.D.N.Y. 2004) ................................................................22

*United States v. Regan*
    937 F.2d 823 (2d Cir. 1991) ................................................................7

*United States v. Rigas*
　　281 F. Supp. 2d 660 (S.D.N.Y. 2003) .......................................................23

*United States v. Romano*
　　938 F.2d 1569 (2d Cir. 1991) ....................................................................5

*United States v. Scarpa*
　　913 F.2d 993 (2d Cir. 1990) ....................................................................24

*United States v. Spinelli*
　　352 F.3d 48 (2d Cir. 2003) ......................................................................19

*United States v. Strawberry*
　　892 F. Supp. 519 (S.D.N.Y. 1995) ..........................................................16

*United States v. Torres*
　　901 F.2d 205 (2d Cir. 1990) ....................................................................26

*United States v. Turoff*
　　853 F.2d 1037 (2d Cir. 1988) ..................................................................17

*United States v. Walker*
　　922 F. Supp. 732 (N.D.N.Y. 1996) ..........................................................28

*United States v. Walsh*
　　194 F.3d 37 (2d Cir. 1999) ......................................................................15

*Zafiro v. United States*
　　506 U.S. 534, 113 S. Ct. 933 (1993) ..................................................19, 23

## STATUTES

18 U.S.C. § 2 ...............................................................................................6, 15

18 U.S.C. § 371 .................................................................................................5

18 U.S.C. § 3500 .............................................................................................28

26 U.S.C. § 7201 ......................................................................................5, 6, 15

26 U.S.C. § 7206(1) ......................................................................................5, 6

26 U.S.C. § 7206(2) ..........................................................................................6

## RULES AND OTHER AUTHORITY

Fed. R. Crim. P. 7 ................................................................................................1, 24, 25

Fed. R. Crim. P. 8 ................................................................................1, 4, 17, 18, 19, 25

Fed. R. Crim. P. 12(b)(3)(B) .............................................................................................1

Fed. R. Crim. P. 14(a) ..............................................................................................1, 4, 19

Fed. R. Crim. P. 16 ...........................................................................................................28

I.R.S. Announcement 2002-97 (Oct. 4, 2002) ................................................................10

I.R.S. Notice 2001-45 (July 26, 2001) .......................................................................10, 12

Treas. Reg. § 1.752-6T, 68 F.R. 37434 (June 23, 2003) ..................................................12

Defendant John Lanning respectfully submits this memorandum of law in support of his motions: (1) for dismissal of the charges against him (Counts One through Forty) of the superseding indictment (the "Indictment") pursuant to Fed. R. Crim. P. 12(b)(3)(B) for failure to state an offense; (2) for severance pursuant to Fed. R. Crim. P. 8(b) and 14(a); (3) to strike paragraphs 59 though 63 of the Indictment concerning the alleged obstruction of the IRS and Senate investigations; (4) for a bill of particulars pursuant to Fed. R. Crim. P. 7(f); and (5) to require the government and the IRS to preserve copies of the notes of the various witness interviews conducted by the government.  Lanning also joins in the joint motions submitted on behalf of certain defendants and the individual motions of his co-defendants to the extent that they apply to Lanning.

## PRELIMINARY STATEMENT

John Lanning was a certified public accountant ("CPA") and tax partner at KPMG LLP from 1982 though 2000.  Indictment ("Ind.") ¶ 9.  Lanning became the Vice Chairman of Tax Services in October 1996.  (*Id.*).  Lanning stepped down from this position on or about July 1, 2000, and retired completely from KPMG on or about January 3, 2001.

The Indictment charges a decade-long conspiracy (from 1996 through 2005) to violate the federal tax laws and 39 separate counts of income tax evasion by nineteen professionals — seventeen of whom, like Lanning, were former partners and managers of KPMG.  The Indictment alleges that the defendants devised, marketed and implemented, on behalf of KPMG, four allegedly fraudulent tax shelters—FLIP, OPIS, BLIPS and SOS.[1]  Eschewing the pleading of

---

[1] FLIP is the Foreign Leveraged Investment Program; OPIS is the Offshore Portfolio Investment Strategy; BLIPS is the Bond Linked Issue Premium Structure; and SOS is the Short Option Strategy.  (Ind. ¶ 28).  These transactions are described in detail in the various joint motions.  We hereby incorporate those descriptions by reference herein.

facts, the Indictment speaks in sound-bites and is replete with such rhetoric as the phrases

"fraudulent tax shelters" and "phony tax losses" without a meaningful, balanced and disciplined

discussion of the tax transactions at issue in the case.[2]  The Indictment's description of these

transactions is misleading.  At the heart of the alleged "conspiracy," is the issuance of opinions

that the tax shelters were "more-likely-than-not" to stand-up if challenged in court.[3]

After reading the Indictment, one might be left with the misimpression that these tax

shelters had no basis under the tax law.  That is simply wrong.  As explained below, each of the

transactions charged in the Indictment conformed with the letter of the Internal Revenue Code

(the "Code" or "I.R.C.") and decades of precedent at the time they were entered into and at the

time the tax returns at issue were filed.  There was no Code provision, no Revenue Ruling, no

Treasury Regulation, and no court decision that prohibited these transactions at the time in

question.  At most – drawing all inferences in favor of the government – the law was uncertain

during the relevant time period with respect to the legality of these tax shelters.

While mindful of the Court's admonition at the arraignment that there is no summary

judgment in criminal cases, tax cases are nonetheless *sui generis*.  Under the law in the Second

Circuit, the district court must act as a gatekeeper in the first instance with respect to whether or

---

[2] FLIP and OPIS are described in a single paragraph as "purported," "pre-arranged series" of "investment transactions" with a "Cayman Islands entity" that were devised to "eliminate economic risk" and generate "substantial and phony capital losses."  (Ind. ¶ 34).  The descriptions of BLIPS and SOS are similarly threadbare. According to the Indictment, the "fraudulent BLIPS Shelter" was "designed to generate any amount of capital and ordinary tax losses through a series of pre-arranged transactions" involving a "purported" bank loan in order to make "purported foreign currency investments including currencies that were pegged to the United States dollar."  (*Id.* at ¶ 38).  SOS is described not as one type of shelter, but as a series of shelters "designed to generate substantial capital and ordinary tax losses through a series of pre-arranged transactions that involved the client entering into virtually offsetting foreign currency option positions with a bank . . . sometimes transferring the offsetting positions to a partnership or other entity, and then withdrawing from the transaction, claiming a loss in the desired amount."  (*Id.* at ¶ 47).

[3] (Ind. ¶ 27 ("In order to conceal the true nature of the tax shelter[s] from the IRS, to attempt to evade the wealthy clients' U.S. individual income taxes, and to shield the clients from IRS penalties for underpayment of income taxes, KPMG and/or a law firm provided the clients with opinion letter containing false and fraudulent representations and statements and claiming that the tax shelter losses were 'more likely than not' to survive IRS challenge.")).

not the tax law was uncertain or ambiguous at the time of the alleged conduct.  The Supreme Court and the Second Circuit have held that where the tax law is unclear, the government cannot, as a matter of law, make the requisite showing of willfulness—which, in criminal tax cases, is the voluntary, intentional breach of a known legal duty.  Where the law is uncertain, there can be no violation of a known legal duty.  For these reasons, Counts One through Forty against Lanning must be dismissed for failure to state an offense.

The substantive tax evasion counts against Lanning – Counts Two through Forty – also fail to state an offense and therefore must be dismissed for the separate and independent reason that they fail to allege what precisely Lanning did with regard to each individual count of tax evasion.  Despite its length, complexity, and repetitiveness, the Indictment contains very few specific allegations concerning Lanning.  Indeed, he is mentioned in but five of the fifty-two overt acts alleged in the Indictment.  It alleges that he supervised others (which was his job), participated in the approval of certain tax shelters, and participated in the decision not to register certain tax shelters.  None of these acts constitutes an affirmative act of tax evasion.  Indeed, there is no allegation that Lanning was involved in any way in preparing or filing the tax returns, designing the tax shelters, or drafting the opinion letters at issue.  In fact, it is undisputed that he did none of these things.  Moreover, as set forth in the Motion to Dismiss for lack of venue submitted by co-defendant Jeffrey Stein, which Lanning joins, there is no venue over these various substantive income tax evasion Counts in the Southern District of New York.

Should this Court allow the Indictment to survive in some form, severance is mandated here.  First and foremost, the Indictment misjoins the income tax evasion Counts against defendants Ruble, Larson and Pfaff (Counts Forty-One through Forty-Four) relating to Ruble's personal income taxes.  Ruble's alleged income tax evasion did not involve any of the tax

shelters at issue here.  Lanning had no involvement with Ruble's alleged income tax evasion, and there is no allegation to the contrary.  The Indictment also misjoins the Counts charging obstruction of the IRS against defendants Smith, Gremminger, and Eischeid (Counts Forty-Five and Forty-Six) with the charges against Lanning.  Lanning never testified before the IRS or Congress, nor had anything whatsoever to do with others' dealings with or testimony before either the IRS or Congress.  Indeed, Lanning had long since retired from KPMG as of the dates of the alleged obstruction.  For these reasons, Counts Forty-One through Forty-Four and Counts Forty-Five and Forty-Six are unrelated to the allegations against Lanning and do not arise out of a common scheme or plan.  Accordingly, these Counts cannot be joined in the same indictment as the counts against Lanning and must be severed pursuant to Fed. R. Crim. P. 8(b).

In addition to the severance of counts, severance of defendants is also required under Fed. R. Crim. P. 14(a) and Second Circuit precedent.  The trial of nineteen defendants together is unmanageable and will severely prejudice Lanning.  At a minimum, the legal authorities require that this case be broken into groups of similarly situated defendants.

In addition to his motions for dismissal and severance, Lanning requests: (1) an order striking paragraphs 59 though 63 of the Indictment concerning the alleged obstruction of the IRS and Senate investigations in which Lanning was not involved, which are not part of the conspiracy charged and which admittedly occurred well after Lanning retired from KPMG; (2) a bill of particulars; and (3) an order requiring the government and the IRS to preserve all copies of the notes of the various witness interviews conducted by the government.

# ARGUMENT

## I.      The Charges Against Lanning Must Be Dismissed for Failure to State an Offense

The charges against John Lanning (Counts One through Forty) must be dismissed for failure to state an offense. As explained more fully below, each of the Counts against Lanning requires that the government prove willfulness, or what the Supreme Court has described as the voluntary, intentional violation of a known legal duty. Counts One through Forty do not and indeed cannot, as a matter of law, allege willfulness and therefore must be dismissed.

### A.      Elements of the Offenses

Count One of the Indictment alleges a tax fraud conspiracy in violation of 18 U.S.C. § 371. The Indictment charges four objects of this conspiracy:

1)      a *Klein* conspiracy to defraud the United States and the IRS (Ind. ¶ 73);[4]

2)      an attempt to evade income taxes of tax shelter clients and others in violation of 26 U.S.C. § 7201 (Ind. ¶ 74);[5]

3)      the making of and subscribing tax returns that were materially false, and causing the same to be done, in violation of 26 U.S.C. § 7206(1) (Ind. ¶ 75);[6] and

4)      aiding and assisting, procuring, counseling and advising the preparation and presentation of tax returns that were fraudulent and false as to material matters in

---

[4] *See generally United States v. Klein*, 247 F.2d 908 (2d Cir. 1957). Section 371 has two prongs: "(1) conspiring to commit offenses that are specifically defined in other federal statutes, and (2) conspiring to defraud the United States." The second prong – conspiring to defraud the United States – is commonly referred to as a *Klein* conspiracy. *United States v. Helmsley*, 941 F.2d 71, 90 (2d Cir. 1991). The Second Circuit explained that "these offenses overlap when the object of the conspiracy is a fraud on the United States that also violates a specific federal statute." *Id.* (quoting *United States v. Rosenblatt*, 554 F.2d 36, 40 (2d Cir. 1977)).

[5] The elements of the crime of income tax evasion, in violation of § 7201, are: "(1) willfulness; (2) an affirmative act constituting evasion; and (3) the existence of a tax deficiency." *United States v. Klausner*, 80 F.3d 55, 61 (2d Cir. 1997) (internal citations omitted); *see also Helmsley*, 941 F.2d at 83 (citing *Sansone v. United States*, 380 U.S. 343, 351 (1965)); *United States v. Romano*, 938 F.2d 1569, 1571 (2d Cir. 1991).

[6] The elements of the crime of filing a false return, in violation of section 7206(1), are: "(1) that the defendant made or cause to be made, a federal income tax return for the year in question which he verified to be true; (2) that the tax return was false as to a material matter; (3) that the defendant signed the return willfully and knowing it was false; and (4) that the return contained a written declaration that it was made under penalty of perjury." *United States v. Pirro*, 212 F.3d 86, 89 (2d Cir. 2000).

violation of 26 U.S.C. § 7206(2) (Ind. ¶ 76).[7]

Counts Two through Forty charge the substantive crime of income tax evasion in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2.[8]

Each of these alleged crimes – the conspiracy charge (and each of its four objects) and the substantive income tax evasion counts – requires "willfulness."  In *Cheek v. United States*, a criminal income tax evasion case under § 7201, the Supreme Court defined willfulness as the "voluntary, intentional violation of a *known* legal duty."  498 U.S. 192, 200-201, 111 S. Ct. 604, 610 (1991) (citing *United States v. Bishop*, 412 U.S. 346, 360, 93 S. Ct. 2008, 2017 (1973)) (emphasis added).  The various courts of appeals have applied the same definition of willfulness to criminal charges brought under § 7206(1) and § 7206(2) and to allegations of a *Klein* conspiracy.  *See United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) ("Because only willful conduct is criminal under section 7206 and because willfulness requires a voluntary intentional violation of a known duty, the duty involved must be knowable.") (citing *United States v. Mallas*, 762 F.2d 361, 363 (4th Cir. 1985)) (internal quotations omitted); *United States v. Dahlstrom*, 713 F.2d 1423, 1428 (9th Cir. 1983) (overturning a *Klein* conspiracy and § 7206(2) convictions of tax shelter promoters for lack of willfulness).

---

[7] In order to establish a violation of section 7206(2), the government must establish three elements:  "(1) that the defendant aided, assisted, procured, counseled, advised or caused the preparation and presentation of a return, (2) that the return was fraudulent or false as to a material matter, and (3) that the act of the [defendant] was willful."  *Klausner*, 80 F.3d at 59 (citing *United States v. Perez*, 565 F.2d 1227, 1233-34 (2d Cir. 1977)) (internal quotations omitted).

[8] To prove aiding and abetting income tax evasion, the government must demonstrate that "the underlying crime [income tax evasion] was committed by a person other than the defendant, that the defendant knew of the crime, and that the defendant acted with the intent to contribute to the success of the underlying crime."  *United States v. Hamilton*, 334 F.3d 170, 180 (2d Cir. 2003); *see also United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996) ("The government must therefore prove the underlying crime was committed by someone other than the defendant and that the defendant himself either acted or failed to act with the specific intent of advancing the commission of the underlying crime.")

**B.      Willfulness Cannot Be Shown Here as a Matter of Law**

While ordinarily ignorance of the law or a good-faith misunderstanding of the law is not a defense to criminal prosecution, in criminal <u>tax</u> prosecutions, ignorance of the law or a good-faith misunderstanding of the law is a <u>complete</u> <u>defense</u>.  *See Cheek*, 498 U.S. at 202, 111 S. Ct. at 610 ("carrying [the government's] burden requires negating a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any provision of the tax laws.").  The Supreme Court in *Cheek* explained that "[t]his special treatment of criminal tax offenses is largely due to the complexity of the tax laws." *Id*. at 200.  The Second Circuit has described federal taxation as "one of the most esoteric areas of the law . . .  replete with full-grown intricacies, and it is rare that a simple, direct statement of the law can be made without caveat."  *United States v. Regan*, 937 F.2d 823, 827 (2d Cir. 1991) (citations and internal quotations omitted).  Likewise, "new points of tax law" or novel theories of tax law cannot form the basis of criminal liability.  *Pirro*, 212 F.3d at 91.

Thus, for the Indictment to state an offense here, it must plead the existence of a known legal duty.  *Id.* at 90-91 ("this principle [that proof of guilt in tax cases must be predicated upon a voluntary, intentional violation of a known legal duty] has application as well to an indictment") (citing *Regan*, 937 F.2d at 827).  Where the law is at most unclear, as it was with respect to the FLIP, OPIS, BLIPS, and SOS transactions, there can be no violation of a known legal duty as a matter of law.  *Pirro*, 212 F.3d at 91; *see also United States v. Harris*, 942 F.2d 1125, 1131 (7th Cir. 1991) (cited in *Pirro* and stating that "new points of tax law may not be the basis of criminal tax convictions"); *Mallas*, 762 F.2d at 363 (cited in *Pirro* and dismissing convictions of tax shelter promoters, stating that "[i]t is settled . . . that where the law is vague or highly debatable, a defendant – actually or imputedly – lacks the requisite intent to violate it.") (internal citations omitted); *Dahlstrom*, 713 F.2d at 1428 ("We are convinced that the legality of the tax shelter

program advocated by the [defendants] in this case was completely unsettled by any clearly relevant precedent on the dates alleged in the indictment.  It is settled that when the law . . . is highly debatable, a defendant – actually or imputedly – lacks the requisite intent to violate it.") (internal citations omitted).

The leading case in the Second Circuit on this principle is *United States v. Pirro,* 212 F.3d 86 (2d Cir. 2000).  In that case, defendant Albert Pirro was charged with, among other things, subscribing a false tax return in violation of section 7206(1).  *Id.* at 88.  Specifically, that charge centered on the income tax return of Distinctive Properties of Croton, a subchapter S corporation, in which both the defendant Pirro and the Chairman of the Board of the Hudson Valley Hospital Center had interests.  *Id.* at 87.  The section 7206(1) count alleged, in part, that Pirro had submitted a false income tax return for Distinctive Properties by failing to disclose the Chairman's ownership interest in the S corporation.  *Id.* at 88.  The district court dismissed that part of the 7206(1) count because the question of whether Pirro had such a legal obligation to report the ownership interest of the Chairman was "debatable and thus should not supply the predicate for criminal liability." *Id.*  In affirming the district court, the Second Circuit found that the part of the count at issue did "not charge a violation of a known legal duty." *Id.* at 91.  The Court reasoned that "the government has conceded that there was no statute or regulation that specifically stated that S corporations were required to report ownership interests on their corporate tax returns, nor has it provided Second Circuit or Supreme Court authority that so states." *Id.* at 90.

## C.     The Tax Shelters Complied With The Code and the Cases Thereunder

All of the tax transactions at issue – BLIPS, FLIP, OPIS and SOS – complied with the letter of the Code and the applicable regulations and case law.  While each of these transactions

8

involved different structures and different Code provisions, each transaction had a similar premise.  Each transaction involved the taxpayer receiving certain assets as part of the transaction.  The tax laws at the time allowed for a favorable increase in the taxpayer's basis in those assets, which resulted in a capital or ordinary loss to the taxpayer at the conclusion of the transaction.

### 1.      FLIP and OPIS

According to the Indictment, FLIP and OPIS were the same in all material respects.  (Ind. ¶ 34).  The Indictment describes these transactions as follows.  The taxpayer "purportedly entered into an 'investment' transaction with the Cayman Islands entity by purchasing a purported warrant or entering into a purported swap."  (*Id*.)  After this initial contribution by the taxpayer, "the Cayman Islands entity purportedly made a pre-arranged series of purported investments" funded by loans from either "Bank A" or "Bank D."  (*Id*.)  The loans were used to purchase stock of either Bank A or Bank D, depending on which entity made the loan, "followed by a repurchase of that stock by the pertinent bank at a prearranged price."  (*Id*.)  The Indictment further alleges that these investments were "devised to eliminate economic risk to the client beyond the all-in cost and minimize the portion of the client's all-in cost" and "were devised to last for only approximately 16 to approximately 60 days."  (*Id*.)  The Indictment concludes that the defendants "implemented and caused to be implemented FLIP and OPIS transactions and generated and caused to be generated false and fraudulent documentation to support the transactions, including . . . KPMG opinion letters claiming that the purported tax losses generated by the shelters were more likely than not to withstand challenge by the IRS."  (*Id*. at ¶ 35).

It is undisputed, however, that FLIP and OPIS were corporate redemption strategies that, as designed, complied with the literal requirements of the Code.  At the time of these transactions, there was no law prohibiting them.  Indeed, it was not until July 26, 2001, when the IRS issued Notice 2001-45, that the IRS took issue with FLIP and OPIS and maintained for the first time that they did not comport with the IRS' interpretation of the Code.  This notice, which lacks the force of law because it only reflects the IRS's opinion, came out after FLIP and OPIS were no longer sold.  (*See* Ind. ¶¶ 29-30).  Also not without significance is the IRS decision in its enforcement litigation with FLIP taxpayers to allow them to keep 20% of their declared tax losses—which would not be permitted under the applicable IRS regulations were FLIP to be a "fraud."  *See* I.R.S. Announcement 2002-97 (Oct. 4, 2002).

### 2.    BLIPS and SOS

According to the Indictment, BLIPS "was designed to generate any amount of capital and ordinary tax losses through a series of pre-arranged transactions that involved the client purportedly borrowing money from one of four banks . . . in order to make purported foreign currency investments including currencies that were 'pegged' to the United States dollar."  (Ind. ¶ 38).  The Indictment further alleges that the investment by the taxpayer was nominal and was only for a short duration of approximately 67 days.  (*Id.*)  The Indictment alleges that the SOS shelters also involved foreign currency transactions.  According to the Indictment, the SOS transactions "were designed to generate substantial capital and ordinary tax losses through a series of pre-arranged transactions that involved the [taxpayers] entering into virtually offsetting foreign currency option positions with a bank . . . ."  (*Id.* at ¶ 47).  Furthermore, there is no allegation in the Indictment that Lanning participated in the approval, marketing, or implementation of SOS.  (*Id.* at ¶¶ 47-51).

Like FLIP and OPIS, BLIPS, as designed, complied with the letter of the Code and the applicable case law at the time.  To the extent the Government is alleging that Lanning had any involvement with SOS – and there is not a single statement in the Indictment to support such a charge – it too complied with the applicable law at the time.  BLIPS and SOS rely on the principle enunciated in *Helmer v. Commissioner*. T.C. Memo 1975-160, 1975 WL 2787 (1975). There, the taxpayers, who were partners, argued that they did not have a tax gain because their assignment of an option to the partnership was an indebtedness that increased the partners' bases by the amount of the option and thereby offset the gain.  *Id*. at 4.  The IRS, the respondent in the case, successfully argued that "no such liability arose and therefore no adjustments can be made in their bases."  *Id*. at 3.  It is more than a bit ironic that the government advocated the principles set forth in *Helmer* at the time.[9]

*Helmer* is simply one of a long line of partnership-specific cases which stand for the proposition that contingent obligations are not taken into account to determine a partner's basis. *See Long v. Commissioner*, 71 T.C. 1, 7 (1978) *aff'd in part and rev''d in part on other grounds*, 660 F.2d 416 (10th Cir. 1981) ("although they may be considered 'liabilities' in the generic sense of the term, contingent or contested liabilities are not liabilities for partnership basis purposes at least until they become fixed or liquidated"); *LaRue v. Commissioner*, 90 T.C. 465,

---

[9] The result in *Helmer* is not unusual and hardly surprising.  The IRS has repeatedly taken interpretations of the Code where such interpretations redound to its benefit even though the IRS position does not make much, if any, economic sense.  *See, e.g. Commissioner v. Banks*, 543 U.S. 426, 125 S. Ct. 826, 834 (2005) (holding that a plaintiff would be taxed on the entire amount of his award, even though a large portion went directly to his attorney and the Supreme Court recognized that its holding "can lead to the perverse result that the plaintiff loses money by winning the suit"); *Hillman v. IRS*, 250 F.3d 228, 234 (4th Cir. 2001) (holding that even though a literal interpretation of the tax code resulted in an apparently unfair result for the taxpayer, "this is an inequity . . . that only Congress . . . has the authority to ameliorate"); *Speltz v. Commissioner*, 124 T.C. 165, 177 (2005) (holding that the IRS did not abuse its discretion in refusing to settle with a taxpayer whose tax rate under the alternative minimum tax effectively hit 220%, noting that "[w]e do not discern in section 7122 an intent of Congress to override application of specific provisions of the tax laws in every instance in which the liability is perceived to be unfair or inequitable").  What is sauce for the goose is sauce for the gander—a government that eagerly profits from a literal interpretation of the Code should not be allowed to discard the plain language of the Code when it benefits the taxpayer.  This is precisely what the *Helmer* court found.

479-80 (1988) (holding that a partnership's contingent obligation to buy back securities on behalf of customer accounts was too indefinite to qualify as a partnership liability under Section 752).

As recently as 2000 (well after the creation of BLIPS), *Helmer* was cited favorably in *Salina Partnership LP v. Commissioner*, T.C. Memo 2000-352, 2000 WL 1700928 (2000). Indeed, the law remained unchanged until June of 2003, when the IRS issued a new retroactive regulation to repeal the rule established in *Helmer* and its progeny.  *See* Treas. Reg. Sec. 1.752-6T, 68 F.R. 37434 (June 23, 2003).  In fact, the Preamble to Reg. 1.752-6T all but acknowledges this:

> Obligations include, but are not limited to, debt obligations, environmental obligations, tort obligations, contract obligations, pension obligations, obligations under a short sale, and obligations under derivative financial instruments such as options, forward contracts, and futures contracts.  <u>The definition of a liability contained in these proposed regulations does not follow *Helmer v. Commissioner*, T.C. Memo 1975-160 (1975)</u>.  (The Tax Court in Helmer held that a partnership's issuance of an option to acquire property did not create a partnership liability for purposes of section 752).

Preamble to Treas. Reg. § 1.752-6T (emphasis added).  As this quotation from the Preamble demonstrates, *Helmer* stood for the proposition that a contingent liability would not be deducted from basis.  In enacting Regulation 1.752, the IRS acknowledged the interpretation of the law relied upon in the BLIPs transaction and changed it to require that contingent liabilities be deducted from basis.

### D.    Under *Cheek* and *Pirro*, the Indictment Must Be Dismissed

The Government's after-the-fact issuance of new pronouncements relating to these transactions demonstrates that the law was at most uncertain as to their legality in the years prior. The Government's actions in issuing IRS Notice 2001-45 (for FLIP and OPIS) and promulgating Treas. Reg. § 1.752-6T (for BLIPS and SOS) both beg the question: why did the IRS take these

actions if the existing law had already established a "known legal duty?"  The reason is simple. The law at the time did not prohibit these transactions, so there was no known legal duty.  At all relevant times, there was no statute, no Treasury Regulation, no court decision or other authority that prohibited them.  Accordingly, under the principles set forth in *Cheek* and *Pirro*, there cannot be a finding of willfulness as a matter of law and Counts One through Forty of the Indictment must be dismissed.

## II.     The Indictment Violates the Due Process Requirement Of Fair Warning

Tax enforcement under the current labyrinth of the Code involves an entire elaborate civil procedure based upon the notion that taxpayers and the IRS will have differing interpretations of the law, and that the IRS's interpretation is not automatically controlling.  In any event, to attach criminal liability to an act, the legality of which was at most unclear at the time, violates the constitutional doctrine of fair warning for criminal statutes.  *See Pirro*, 212 F.3d at 91 ("The tax law provided Pirro no notice that failure to report an 'ownership interest' was criminal."); *Mallas*, 762 F.2d at 363 ("Criminal prosecution for the violation of an unclear duty itself violates the clear constitutional duty of the government to warn citizens whether particular conduct is legal or illegal.").

Fundamental principles of due process require that a defendant not be held criminally responsible for conduct that he could not reasonably understand to be prohibited.  *See, e.g., City of Chicago v. Morales*, 527 U.S. 41, 58, 119 S. Ct. 1849, 1860 (1999) ("'No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.'" (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S. Ct. 618, 619  (1939))); *United States v. Lanier*, 520 U.S. 259, 265-66, 117 S. Ct. 1219, 1224-25 (1997) (discussing the "fair warning" requirement).  The Supreme Court has recognized that criminal statutes must provide "'fair

warning . . . in language that the common world will understand, of what the law intends to do if a certain line is passed.  To make the warning fair, so far as possible the line should be clear.'" *Lanier*, 520 U.S. at 265, 117 S. Ct. at 1224-24 (quoting *McBoyle v. United States*, 283 U.S. 25, 27, 51 S. Ct. 340, 341 (1931)).  As the Supreme Court explained in *Lanier*, there are "three manifestations of the fair warning requirement:" (1) "the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application;" (2) the "canon of strict construction of criminal statutes" also known as the "rule of lenity," which "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered;" and (3) "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."  *Lanier*, 520 U.S. at 266, 117 S. Ct. at 1215 (internal quotations and citations omitted).

Of course, the government may revisit its positions with respect to the Code and revise the Code and the regulations thereunder.  But what the government <u>cannot do</u> is to revise the law where it was unclear and then impose criminal liability for conduct that was not within the scope of the Code's prohibitions at the time in question.  The fair warning doctrine prohibits such conduct.  In short, the defendants did not have fair warning that their conduct was criminal. Over a decade ago, Justice Scalia in his concurring opinion in *Cheek* explained that "[t]o impose in addition *criminal* penalties for misinterpretation of such a complex body of law is a startling innovation indeed."  *Cheek*, 498 U.S. at 208, 111 S. Ct. at 614 (Scalia, J. concurring) (emphasis added).

### III.    Counts Two through Forty Must Be Dismissed Because They Do Not Plead Specific Facts As To Lanning

While modern pleading rules require only that indictments "do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime," *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999), "it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species—it must descend to particulars." *Pirro*, 212 F.3d at 93 (quoting *Russell v. United States*, 369 U.S. 749, 765 (1962)).

Here Counts Two through Forty charge Lanning and all of the other named defendants with income tax evasion in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2.  The Indictment does no more than parrot back the statutory language of these statutory provisions.  (Ind. ¶ 80).  The Indictment then includes a bare-bones chart containing just a single line for each alleged Count of  tax evasion with the following information: (1) the name of the client, defendant or entity controlled by the defendant (presumably this is the name of the taxpayer in question although that is not clear); (2) the year and type of tax return at issue; (3) the approximate amount of the fraudulent tax shelter loss; and (4) the approximate date on which the return was filed.  (*Id.*)  There are <u>no</u> <u>specific</u> <u>facts</u> pleaded with respect to Counts Two through Forty which describe a particular criminal act, and therefore they should be dismissed.[10]  Indeed, as explained more fully below, the government has refused to provide particulars in response to the defense's written requests for particulars detailing the alleged unlawful acts with respect to the substantive

---

[10] Counts Two through Forty must also be dismissed for the separate and independent reason that there is no venue for these charges in the Southern District of New York as explained in the motion to dismiss of defendant Jeffrey Stein, which Lanning joins.  Like Stein, Lanning resided and worked in the Southern District of New York during some portion of the alleged conspiracy.  He is identified in five overt acts in furtherance of the conspiracy. (Ind. ¶¶ 78b, 78c, 78f, 78i, 78ii).  None of these acts is an affirmative act of income tax evasion relating to any of the substantive counts charged in Counts Two through Forty.

tax evasion counts.  While "it is a settled rule that a bill of particulars cannot save an invalid

indictment," *Russell v. United States*, 369 U.S. 749, 770, 82 S. Ct. 1038, 1050 (1962), it is

noteworthy that the government refused to provide anything more than the names of the

taxpayers in these transactions.

  The crime of income tax evasion requires an affirmative act of evasion.  *See Klausner*, 80

F.3d at 61; *Helmsley*, 941 F.2d at 83-84.  The statute, however, does not define an affirmative act

of evasion.  But in the leading case of *Spies v. United States*, the Supreme Court provided an

illustrative list of the type of conduct that constitutes an affirmative act of evasion.  The list

includes "keeping a double set of books, making false entries of alterations, or false invoices or

documents, destruction of books or records, concealment of assets or covering up sources of

income, handling or one's affairs to avoid making the records usual in transactions of the kind,

and any conduct, the likely effect of which would be to mislead or conceal."  317 U.S. 492, 499,

63 S. Ct. 364, 368 (1943).  Since the Supreme Court issued this statement, courts have looked to

it for guidance as to what constitutes an affirmative act of evasion.  *See*, *e.g.*, *United States v.*

*Strawberry*, 892 F. Supp. 519, 521 (S.D.N.Y. 1995) (holding that the taxpayer's receipt of

income in the form of cash was an affirmative act of evasion because extensive cash dealings

implied an intent to evade).

  Simply stated, there is not a single allegation that Lanning engaged in any conduct

designed to mislead or conceal.  Indeed, the bulk of the allegations against Lanning aver that he

participated in the approval of opinion letters that allegedly contained false and fraudulent

representations including statements that the tax shelters were more likely than not to survive

IRS challenge.  (Ind. ¶¶ 27, 35, 36(a)-(f), 37, 40(a)-(f), 45, 47, 48, and 49(a)-(d)).  The opinion

letters are not required to be filed as part of the tax return.  Indeed, they are not submitted as part

of the return.  Therefore, the opinion letters cannot provide the basis of liability**.**

## IV.    Severance Is Required

### A.    Lanning Is Improperly Joined Under Rule 8(b)

Under the law, we respectfully submit that this Court must sever the counts relating to

Ruble's alleged income tax evasion (Counts Forty-One through Forty-Four) and the counts

relating to the obstruction of the IRS investigation (Counts Forty-Five and Forty-Six) because

they are misjoined under Rule 8(b).   Federal Rule of Criminal Procedure 8(b) governs when

multiple defendants who are charged in multiple counts may be joined in a single indictment.

*See United States v. Turoff*, 853 F.2d 1037, 1043 (2d Cir. 1988) (explaining the difference

between Rule 8(a) and Rule 8(b)).  Rule 8(b) states:

> **Joinder of Defendants.**  Two or more defendants may be charged
> in the same indictment or information if they are alleged to have
> participated in the same act or transaction or in the same series of
> acts or transactions constituting an offense or offenses. Such
> defendants may be charged in one or more counts together or
> separately and all of the defendants need not be charged in each
> count.

Fed. R. Crim. P. 8(b).  The Second Circuit in *United States v. Turoff* made clear that "multiple

defendants cannot be tried together on two or more similar but unrelated acts or transactions;

multiple defendants may be tried together only if the charged acts are part of a 'series of acts or

transactions constituting an offense or offenses.'"  853 F.2d at 1043 (citing 1 C. Wright, *Federal*

*Practice and Procedure* § 144, at 508-09 (2d ed. 1982)).

Because the offenses relating to Ruble's income tax evasion and the obstruction of the

IRS and Senate investigations are not acts or transactions that are part of the alleged tax shelter

scheme, they are misjoined.  The district court decision in *United States v. Pirro*, 76 F. Supp. 2d

17

478, 488 (S.D.N.Y. 1999), illustrates this point.  There, Judge Parker confronted a substantially

similar fact scenario and granted severance due to improper joinder under Rule 8(b).  *Id.*  In

*Pirro*, the indictment charged both Anthony and Albert Pirro with conspiracy to defraud the

United States by impeding the IRS by evading taxes and preparing and signing false returns

between 1988 and 1997.  *Id.* at 480.  Additionally, the same indictment charged Anthony Pirro

with signing false tax returns for his accounting business, and in separate counts charged

Anthony Pirro with tampering with a grand jury witness, all within the same time period.  *Id.*

The court granted the motion to sever all of these counts based on Rule 8(b) because they were

"simply not unified with the Albert/Anthony Pirro counts relating to the alleged long running

conspiracy between Anthony and Albert Pirro to evade Albert Pirro's tax liability and the filing

of false income tax returns for Albert Pirro and Albert Pirro's companies."  *Id.* at 488.  The court

added that these counts were "not unified by a substantial identity of facts or participants, nor do

they arise out of a common plan or scheme involving [Anthony] and Albert Pirro."  *Id.*  Finally,

Judge Parker noted that "even were joinder proper under Rule 8, the court would, in its

discretion, grant a severance under Rule 14 to prevent undue prejudice."  *Id.* at 488 n.4.

     Lanning's situation with regard to Counts Forty-One through Forty-Four (evasion of R.J.

Ruble's taxes by three other defendants) and Counts Forty-Five through Forty-Six (obstruction of

the IRS by three other defendants) is almost identical to that discussed in *Pirro* and thus these

counts must be severed.  Lanning has been charged with conspiracy and aiding and abetting

income tax evasion relating to certain tax shelter transactions.  As in *Pirro*, Counts Forty-One

through Forty-Six are unrelated to the tax shelter transactions and are "not unified by a

substantial identity of facts or participants, nor do they arise out of a common plan or scheme."

*Pirro*, 76 F. Supp. 2d at 488.  The Indictment does not allege that Lanning participated in any

manner or form in the tax evasion of R.J. Ruble, nor does it allege that Lanning participated in the obstruction of the IRS.  Indeed, there are <u>no</u> facts to support such an allegation.  These are crimes that are disparate from the tax shelter scheme charged in Count One or the income tax evasion Counts relating to the tax shelter charges in Counts Two through Forty.  Moreover, Lanning was long retired from the company when the alleged IRS obstruction took place.  Thus, under Rule 8(b), Counts Forty-One through Forty-Six are misjoined and must be severed from the Counts against Lanning.

### B.       Severance Is Also Warranted Pursuant To Rule 14

Even if the Court were to find joinder proper under Rule 8, this case should be severed pursuant to Fed. R. Crim. P. 14(a), which grants the Court broad discretion to order severance if joinder would unfairly prejudice a defendant:

> **(a) Relief.**   If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a); *United States v. Spinelli,* 352 F.3d 48, 54 (2d Cir 2003) ("The decision to grant or deny severance is committed to the sound discretion of the trial judge.").  Severance should be granted when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro v. United States*, 506 U.S. 534, 539, 113 S. Ct. 933, 938 (1993).  The *Zafiro* court noted that the "risk of prejudice will vary with the facts in each case."  *Id*.

Severance in this case is appropriate for two reasons.  First, the nineteen-defendant trial contemplated in the Indictment, involving an extremely complicated and wide-ranging set of factual allegations, is just the type of mega-trial that the Second Circuit had in mind when it set

19

forth an analytical framework for determining the circumstances under which to sever such trials in *United States v. Casamento*, 887 F.2d 1141 (2d Cir. 1989).  *See also United States v. Bellomo*, 954 F. Supp 630, 648-49 (S.D.N.Y. 1997) (Kaplan, J.) (applying *Casamento* to a case with 19 defendants and holding that severance into two trials was warranted).  Second, independent of the length and chaos of a trial of all nineteen defendants, Lanning would suffer unfair and irreparable prejudice from being tried with defendants who are charged with conduct very different than that charged against Lanning himself.  Only through a reasoned severance can this case fairly be tried and defended.

### 1.  Applying the *Casamento* analysis, this "mega-trial" should be severed

In *Casamento*, the Second Circuit established a practical analysis to guide courts in determining when to sever contemplated "mega-trials" into two or more trials in the interest of serving "the fair administration of justice" even where a court finds that a single trial would not offend due process.  887 F.2d at 1151.  That analysis begins with the prosecutor's "good faith estimate of the time reasonably anticipated to present the government's case." *Id*.  If that estimate exceeds four months, "the judge should oblige the prosecutor to present a reasoned basis to support a conclusion that a joint trial of all the defendants is more consistent with the fair administration of justice than some manageable division of the case into separate trials for groups of defendants." *Id*. at 1152.  In determining the adequacy of this showing, the Court "should weigh the interests of the prosecution, the defendants, the jurors, the court, and the public." *Id*.  The prosecutor must make an "especially compelling justification" for a joint trial when, as in the case at bar, there are more than ten defendants. *Id*.

The threshold analysis in *Casamento* involves whether or not the government's case will exceed four months. *Id*.  While the starting point for this analysis is the prosecution's "good

faith estimate," the Court is not bound by that estimate "but should be free to make an independent assessment based on various factors including the number of defendants, the time and territorial scope of the crimes charged, the number of witnesses likely to be called, and the number and size of exhibits likely to be introduced."  *Id*.  In this case, the government has orally represented to the Court that the *entire trial* of these nineteen defendants – involving many complex transactions over a nearly ten-year period, dozens of witnesses, and hundreds if not thousands of documents – will take no more than *three months*.  (*See* Tr. of Hearing, Oct. 17, 2005, at 5 ln. 2).  This estimate, however, is exactly the same estimate the government made to the Court at the time of the initial arraignment, when there were only ten defendants in the case who were charged with only one count of conspiracy: "I believe it [the trial] would be about three months, your Honor."  (Tr. of Hearing, Sept. 6, 2005, at 17 ln. 20-21).  It cannot be that the addition of nine extra defendants to the case and 45 additional counts will have no affect whatsoever on the length and complexity of the trial.  A more realistic estimate of a 19-defendant, 45-count criminal trial is at least six months.

    *Casamento* makes clear that the Court is not bound to accept the government's estimate of a three-month trial and may use its own judgment.  887 F.2d at 1151-52.  All indications are that this trial promises to be massive.  Indeed, recent complex criminal trials in this courthouse undermine the Government's three month estimate.  For example, the trial of former Adelphia CEO John J. Rigas and three other defendants who were each charged with 23 counts lasted four and a half months.  Barry Meier, *At Last, Jurors Are About to Consider Adelphia Case*, N.Y. Times, June 25, 2004, at C3.  The one-defendant trial of former WorldCom chairman Bernard J. Ebbers on only nine counts lasted about two months  Ken Belson, *WorldCom Head is Given 25 Years For Huge Fraud*, N.Y. Times, July 14, 2005, at A1.

The *Casamento* court held that the presence of only ten defendants would increase the government's burden to an "especially compelling justification" for a single trial. 887 F.2d at 1152. Given the exceedingly high likelihood of a trial lasting well over four months, the large number of defendants, the disparate allegations, and the massive document collection, the "fair administration of justice" requires severance in this case. A reasoned severance would result in several trials in which defendants similarly situated are tried together. Lanning's role in the alleged conspiracy is limited to his approval of the transactions at issue, and participation in the decision not to register certain of the tax shelters, and he had no involvement whatsoever with a single taxpayer referred to in the Indictment. Common sense dictates that he should be tried with those who also participated in those decisions.

> **2.    Even if the Court does not apply the special *Casamento* procedures for "mega-trials," severance is still warranted under applicable case law**

The procedure set forth in *Casamento* is expressly for "mega-trials" like this one; but the Southern District has also established a severance analysis that applies to any case, regardless of size and scope. Thus, even if the Court does not apply *Casamento*, severance is still warranted under the applicable case law. Courts consider eight factors when determining whether severance is warranted:

> (1) the number of defendants and the number of counts; (2) the complexity of the indictment; (3) the estimated length of the trial; (4) disparities in the degrees of involvement by defendants in the overall scheme; (5) possible conflict between various defense theories; and (6) prejudice resulting from evidence admissible as to some defendants, but not others.

*United States v. Ramos*, 346 F. Supp. 2d 567, 570 (S.D.N.Y. 2004) ("While none of these factors is dispositive, each is intended to provide guidance as to whether a jury will be capable of considering the evidence as to each defendant separately, independent of evidence against co-

defendants.").  Applying these factors to the Indictment illustrates that a 19-defendant trial would cause Lanning serious prejudice, preventing the jury from making a reliable judgment about guilt or innocence, while severance would not impair judicial economy and may, in fact, conserve the resources of the parties and the Court.

Complex trials make it difficult for jurors to keep straight the specific evidence and charges against each defendant; this is aggravated where, as here, there are 19 defendants who are named in a "small portion of the indictment" and against whom "only a small portion of the evidence is relevant."  *United States v. Rigas,* 281 F. Supp. 2d 660, 673 (S.D.N.Y. 2003).  If Lanning is not severed, he will be "relegate[d] to sitting silently by for extended periods of time while this evidence is offered against [other defendants]" especially as it relates to events that occurred after his retirement from KPMG in January 2001.  *United States v. Gatien*, No. 96 Cr. 430, 1997 WL 661138, at *3 (E.D.N.Y. Oct. 20, 1997).

Severance would not significantly impair the efficiency of trial and, in fact, could conserve the resources of the parties, the jury and the Court.  The primary concern when considering severance, other than preventing prejudice to defendants, is protecting the economy of trials.  *See Zafiro*, 506 U.S. at 537, 113 S. Ct. at 937.  But as courts have recognized, long, complex, joint trials impose significant hardships on defendants, jurors and judges, *see, e.g., United States v. Gallo*, 668 F. Supp. 736, 754-55 (E.D.N.Y. 1987), and severance can actually reduce these burdens.  Severing Lanning's trial along the lines proposed herein, would conserve judicial resources and would guard against unfair prejudice.

## V.    Paragraphs 59 Through 63 of the Indictment Should Be Stricken Because They Are Irrelevant To The Crimes Charged And Are Highly Prejudicial

Paragraphs 59-63 of the Indictment allege that certain defendants obstructed the IRS and the Senate investigations.  (*See* Ind. ¶¶ 73-76).  While these allegations are referenced in the

23

conspiracy Count (Count One), the obstruction of the IRS and Senate investigations is <u>not</u> <u>listed</u> as an object of the conspiracy.  Indeed, it could not have been an object of the alleged conspiracy as the IRS and Senate investigations did not even exist until sometime in 2002.[11]  Accordingly, it is not relevant to the crime charged.  Furthermore, Lanning is not mentioned in any of these paragraphs.  This is not surprising since Lanning retired from KPMG in January of 2001 – long before the Senate and IRS investigations – and did not testify before the IRS or Senate.  As such these inflammatory and irrelevant allegations are unfairly prejudicial to Lanning, and should be stricken pursuant to Fed. R. Crim. P. 7(d).

Fed. R. Crim. P. 7(d) provides that "the Court on motion of the defendant may strike surplusage from the indictment or information." Fed. R. Crim. P. 7(d).   Such a motion will be granted "only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial."  *United States v. Mulder,* 273 F.3d 91, 99-100 (2d Cir. 2001); *United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996); *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990).  Courts in the Second Circuit have granted motions to strike surplusage where the allegations or facts at issue are unnecessarily prejudicial or inflammatory.  *See*, *e.g.*, *United States v. Gotti*, 42 F. Supp. 2d 252, 292-93 (S.D.N.Y. 1999) (granting a motion to strike a "conspired to murder" clause where pleas by former co-defendants rendered it inapplicable and prejudicial); *United States v. Miller,* 26 F. Supp. 2d 415, 420-21 (N.D.N.Y. 1998) (granting a

---

[11] A conspiracy does <u>not</u> automatically encompass an after-the-fact cover-up, and courts have rejected such allegations by the government.  *See United States v. Marcus Schloss & Co., Inc.*, 710 F. Supp. 944, 949 (S.D.N.Y. 1989) (rejecting the government's argument that "obstructing the SEC inquiry alleged in . . . the conspiracy count forms an inherent and indivisible part of a single conspiracy"); *see also United States v. Grunewald*, 353 U.S. 391, 401-02, 77 S. Ct. 963, 972 (1957) ("After the criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment.").

motion to strike prejudicial and inflammatory references that implied defendants' involvement in uncharged acts of violence).

In paragraphs 59 through 63 of the Indictment, the government alleges that, beginning in October of 2001, certain co-defendants in this case engaged in various acts constituting what it calls "Obstruction of IRS and Senate Investigations." (Ind. ¶¶ 59-63). As discussed above, these allegations relating to the obstruction of the IRS and Senate investigations are misjoined under Fed. R. Crim. P. 8(b). There are four objects of the alleged conspiracy and obstruction of the IRS and Senate is not one of them. (*See* Ind. ¶¶ 73-76). Lanning is not named anywhere in these paragraphs relating to the obstruction, nor is he alleged to have engaged in any obstruction of IRS or Senate investigations. The inclusion of these allegations is inflammatory and prejudicial to Lanning. Because the government has not charged Lanning with obstruction nor included it as an object of the conspiracy, the inclusion of these allegations in Count One of the Indictment is patently improper. Thus, this court should strike paragraphs 59-63 from the Indictment.

## VI.  The Court Should Direct The Government To Supply A Bill Of Particulars

This court should order the government to produce a bill of particulars because the Indictment on its face is woefully inadequate and fails to fully state the nature of the charges against John Lanning. Furthermore, the government's massive production of documents does not relieve it of the burden to specify the particulars requested because of the size and complexity of the production.

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars "in order to identify with sufficient particularity the nature of the charges pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United*

*States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *see also United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *cert. denied*, 498 U.S. 906 (1990) (stating that a bill of particulars should provide a defendant with details of the charge for preparation of defense and to avoid prejudice and surprise at trial). The decision to order the filing of a bill of particulars rests within the sound discretion of the district court. *United States v. Barnes*, 158 F.3d 662, 665-66 (2d Cir. 1998); *United States v. Harding*, 273 F. Supp. 2d 411, 429 (S.D.N.Y. 2003) (Kaplan, J.).

In a letter dated November 9, 2005 and addressed to the government,[12] counsel for Lanning joined in the request for a bill of particulars submitted by counsel for David Rivkin.[13] In that letter, counsel for Lanning also requested four additional particulars relating to the allegations against him. The government responded with a letter dated November 15, 2005 detailing the names of individual taxpayers referenced in Counts Two through Forty, but refused to provide any other particulars.

A bill of particulars is required "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990). Courts have required a bill of particulars "due to the complexity of the charges and the paucity of information and/or unwieldiness of the documents provided to the defendant." *See, e.g.*, *Harding*, 273 F. Supp. 2d at 430, n.108. A court may deny a request for a bill of particulars if the Government has provided the information sought in the

---

[12] A true and accurate copy of which is attached as Exh. 1 to the Declaration of Robert H. Hotz, Jr., ("Hotz Decl.") attached hereto as Exh. A.

[13] The particulars that Lanning sought are as follows: (1) specifics on his alleged involvement in the design, implementation, and marketing of the "SOS" product; (2) specifics on his alleged participation in the obstruction of the IRS and Senate investigations; (3) the identity of all alleged but unnamed co-conspirators that the government believes participated in the alleged conspiracy; and (4) particulars as to the government's claim that Lanning aided and abetted the commission of the 39 counts of tax evasion detailed in Counts Two through Forty of the Indictment. In accordance with Local Criminal Rule 16.1, counsel for Lanning and counsel for the Government have conferred in good faith in an effort to resolve the issues raised in this request for particulars, but have been unable to reach a resolution. *See* Hotz Decl.

indictment or in "some acceptable alternative form."  *Bortnovsky*, 820 F.2d at 574.  However, "the prosecution does not fulfill its obligations 'merely by providing mountains of documents to defense counsel who were left unguided' as to the nature of the charges pending."[14]  *Harding*, 273 F. Supp. 2d at 430 (citing *Bortnovsky*, 820 F.2d at 574).

The conclusory nature of the Indictment requires the government to produce a bill of particulars.  The case against Lanning is indisputably complex.  The government has refused to provide Lanning's request for particulars relating to Lanning's involvement in certain transactions, which have been described in the Indictment only in sweeping, general terms.  The government has provided no supporting evidence for these particular allegations in the Indictment, nor is the evidence contained in an easily accessible format in the massive production that the government has provided.

Lanning also requests that the government identify all of the alleged and unnamed co-conspirators that the government believes participated in the alleged conspiracy.  Requests for names of unindicted co-conspirators are routinely granted by district courts.  *See, e.g.*, *United States v. Nachamie*, 91 F. Supp. 2d 565, 573-74 (S.D.N.Y. 2000); *United States v. Lino*, No. 00 CR. 632 (WHP), 2001 WL 8356, at *13 (S.D.N.Y. Dec. 29, 2000); *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), *aff'd* 875 F.2d 857 (2d Cir. 1989).  In considering whether to grant a request for a bill of particulars providing the names of unindicted co-conspirators, a court should consider (1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the Government otherwise has provided adequate notice of the

---

[14] *See, e.g., United States v. Davidoff*, 845 F.2d 1151, 1155 (2d Cir. 1988) (holding that a bill of particulars was required where the provision of 6,000 pages of material was "inadequate to furnish notice."); *United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000) (requiring a bill of particulars where the government produced 200,000 documents relating to Medicare claims, but did not specify which claims were alleged to be false); *United States v. Lino*, No. 00 CR. 632 (WHP), 2001 WL 8356, at *13 (S.D.N.Y. Dec. 29, 2000) (requiring a bill of particulars where the government alleged various conspiracies involving twenty-three defendants and over 500,000 pages of documents).

particulars; (4) the volume of pretrial discovery, (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government investigation. *Nachamie*, 91 F. Supp. 2d at 573-74.

These factors weigh in favor of requiring the government to provide particulars naming all un-indicted co-conspirators. This is a white-collar case and there is no danger whatsoever to the alleged co-conspirators mentioned in the Indictment. The conspiracy is alleged to have taken place over the course of almost 10 years, and the volume of discovery is immense. Accordingly, this court should grant Lanning's request for a bill of particulars and require the government to produce it as soon as reasonably practicable.

## VII.   This Court Should Instruct the Government to Preserve Agents' Notes

Lanning moves for a court order instructing the government to preserve all handwritten or typed notes of government agents and law enforcement investigators that may be discoverable under the Jencks Act, 18 U.S.C. § 3500, and Rule 16 of the Federal Rules of Criminal Procedure.

A defendant is entitled to require the government to instruct agents to retain such notes where the documents constitute "material potentially discoverable under the Jencks Act." *United States v. Walker*, 922 F. Supp. 732, 744 (N.D.N.Y. 1996). The government's obligation to preserve such material and inform its agents of the obligation to preserve is "well established by case law." *United States v. Feola*, 651 F. Supp. 1068, 1136 (S.D.N.Y. 1987) *aff'd.*, 875 F.2d 857 (2d Cir. 1989), *cert. denied,* 493 U.S. 834 (1989). Moreover, such requests are commonly granted in the Second Circuit. *See, e.g., Feola*, 651 F. Supp. at 1136-37; *United States v. Nunez*, No. 00-CR-121, 2001 WL 91708 (S.D.N.Y. Feb. 1, 2001); *United States v. Gullo,* 672 F. Supp. 99, 105 (W.D.N.Y. 1987); *United States v. Cordero*, No. 97-CR-63, 1998 WL 160819 at *1 (N.D.N.Y. 1998).

Here, the government, IRS agents, and other investigators involved in the case are presumably in possession of notes that could later be discoverable under the Jencks Act. Pursuant to this precedent and in light of the possibility of Jencks Act application in this case, this court should order preservation of those notes until a determination of their discoverability is made.

**CONCLUSION**

For the foregoing reasons, this Court should grant Lanning's pre-trial motions in all respects.

Dated:  New York, New York
        January 12, 2006

                                        Respectfully submitted,
                                        AKIN GUMP STRAUSS HAUER & FELD LLP


                                By:     /s/ Michael J. Madigan _____
                                        Michael J. Madigan (*pro hac vice*)
                                        Robert H. Hotz, Jr. (RH 4456)
                                        Christopher T. Schulten (CS 7320)
                                        590 Madison Avenue
                                        New York, New York 10022
                                        (212) 872-1000

                                        *Attorneys for Defendant John Lanning*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of January 2006, I filed a true and accurate copy of

1) *Defendant John Lanning's Memorandum of Law in Support of His Motion to Dismiss the*

*Indictment or, in the alternative, for Severance, to Strike, for Particulars, and to Require the*

*Preservation of Government Agents' Notes*; and 2) the *Declaration of Robert H. Hotz, Jr.* through

this Court's CM/ECF system, which will send notification of such filing to registered counsel

electronically.

/s/ Christopher T. Schulten
Christopher T. Schulten