UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                           Plaintiff,

   -against-

JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID GREENBURG,

                           Defendants.

05 CR 00888 LAK (ECF)

**JOINT MEMORANDUM OF POINTS AND AUTHORITIES BY DEFENDANTS JOHN LARSON AND ROBERT PFAFF RE:**

**(1) MOTION FOR DISCLOSURE OF RULE 16 AND BRADY MATERIAL;**

**(2) MOTION FOR BILL OF PARTICULARS; AND**

**(3) MOTION TO DISMISS FOR LACK OF VENUE**

---

## MOTION FOR DISCLOSURE OF RULE 16 AND BRADY MATERIAL

      Following a massive, multi-year investigation, the government has charged 19 professionals (so far) with a vast conspiracy implicating more than 600 prominent investors throughout the country over a span of almost 10 years. The defendants are alleged to have committed the specific intent crime of tax evasion, yet the government takes the position that there is no favorable or exculpatory evidence at all. The government also has rejected each of our detailed requests for Rule 16 and Brady materials. We respectfully ask the Court to intervene and to order the government to produce the materials listed in the accompanying proposed order, so that the defense has access to the materials it needs.

## I.     INTRODUCTION

      The government has brought an extraordinarily complicated case, alleging that 19

professionals conspired with hundreds more for almost 10 years to commit willful tax evasion in at least 4 highly complex investment programs. Having charged a Section 7201 tax evasion conspiracy, the government takes on its highest burden – specific intent in a regulatory offense. The government must establish that specific entries on taxpayers' returns were false; that the taxpayers knowingly and willfully swore to these falsehoods; that the defendants willfully aided and abetted these crimes as principals; and, that the tax laws were so clear that everyone involved understood them, yet specifically intended to violate them.

The government's massive investigation includes an unknown number of civil and criminal agents, investigators and attorneys. Regarding just the BLIPS civil and criminal investigations, we have had contact with no fewer than nine Justice Department lawyers. When a defense group was attempting to review boxes in the Queens warehouse last fall, our group was outnumbered by a team of agents working full-time, removing documents from the discovery previously produced in the government's vaunted open files policy. See Declaration of Karli E. Sager (Sager Decl.), Exhibit A (December 14, 2005 letter). The IRS Commissioner, with the Attorney General at his side, bragged about the government's use of parallel civil and criminal proceedings to gather evidence and to pressure taxpayers and tax professionals. See Sager Decl., Exhibit B (Prepared Remarks of Mark Everson) ("Also, during this investigation, the IRS and Southern District of New York broke new ground on the use of parallel civil and criminal enforcement."). Literally thousands of subpoenas and summonses have been issued, and the government continues to issue subpoenas, to meet with witnesses or their lawyers, and to threaten future indictments against those who do not "cooperate."

Yet despite this tremendous accumulation of information, the government takes the remarkable litigation position that it has uncovered absolutely no evidence favorable to the defense. When we first learned this, we thought perhaps that a zealous prosecution team was simply unable to recognize evidence that opposes the prosecution's theories. So we sent two more requests -- one a detailed description of 16 categories of Brady and Rule 16 material, and another a specific request for privilege logs of documents withheld by the government and by private parties. But again, the prosecution takes the position that there is no favorable defense

material at all.  <u>See</u> Sager Decl., Exhibits A, C (September 27, 2005 letter), D (November 7, 2005 letter), E (December 4, 2005 letter).

The prosecution's claim that there is no material in its possession favorable to the defense in this complex case belies common sense.  Just as a matter of logic, we suspect that a great many witnesses have informed the IRS or this prosecution team, or both, that they believed the investments at issue in this case were appropriate under the tax laws.  Investors; their lawyers, accountants, and financial advisors; IRS professionals; alleged coconspirators; possible government experts – any informed person who states that he or she believed these challenged investments are legal or their economics are real – all likely have provided the government with evidence that is material to and favors the defense.  This evidence tends to show that there was no specific intent to evade the tax laws.

In addition to our common sense belief, for reasons we will describe below, we know that this evidence exists.  And the government does not deny it.  So, there is no doubt that critical evidence that goes to the heart of this case is sitting today in government file drawers.  The prosecution just argues that it can bury the evidence.  We respectfully request the Court's intervention to assure that the prosecution's desire to win does not overwhelm its duty to Justice.

## II.    THE ALLEGATIONS AND FACTUAL CONTEXT

### A. <u>What The Government Must Prove In This Prosecution</u>

The touchstone for our requests is the breadth and complexity of these tax evasion conspiracy charges.  The government's indictment is rather direct in accepting that it must establish the defendants' specific intent to break the law involving some of the most complex tax and economics doctrines.  For example, the indictment charges the defendants with:

- violating the "economic substance and business purpose test" (¶ 36(h)).

This is an evolving judicial doctrine where, in some circumstances, the IRS can challenge investments that meet all of the requirements of the Tax Code, but lack the then-applicable standards of sufficient "economic substance" or "business purpose."  The Circuits are

and have been split several ways on this test, and the Federal Court of Claims recently criticized the entire concept, stating:

> [W]here a taxpayer has satisfied all statutory requirements established by Congress, as Coltec did in this case, the use of the "economic substance" doctrine to trump "mere compliance with the Code" would violate separation of powers.

Coltec Industries, Inc. v. United States, 62 Fed. Cl. 716, 756 (2004) (currently on appeal).

- violating the "'step transaction doctrine' – a legal doctrine permitting the IRS to disregard certain transactions having no economic substance or business purpose" (¶ 36(h)).

The step transaction doctrine is another complicated set of evolving laws permitting the IRS in some situations to collapse a series of transactions into a single transaction for tax analysis purposes. The tax opinions in these cases spend many pages analyzing the step transaction doctrine and its applications.

- "not registering the tax shelters with the IRS as required by law" (¶¶ 54, 55, 56).

At the time of the alleged tax evasion conspiracy, only those transactions that satisfied the complex requirements of prior Internal Revenue Code ("IRC") section 6111 were required to be registered. Determining whether a given transaction fell within the statutory definition of a "tax shelter" for which registration was required involved a complicated analysis of whether, as of the close of any of the first 5 years ending after the date on which the investment was offered for sale, the "tax shelter ratio" – generally, the ratio of expected deductions and 350 percent of the expected credits to the "investment base" – was greater than 2 to 1. See I.R.C. § 6111(c), prior to amendment by P.L. 108-357, § 815(a). In many cases, determining whether certain amounts should be included in or excluded from the "investment base" required a complex exercise in statutory interpretation. (In 2004, Congress replaced these registration rules with an entirely different disclosure regime, citing the need for "a single, clear definition regarding the types of transactions that must be disclosed." H.R. Rep. No. 108-548, at

269 (2004).)

- writing opinion letters that fraudulently opined it was "more likely than not" that the tax treatment would be approved by a court if the IRS challenged it (¶¶ 35, 36, 40).

By one practitioner's count, there are 12 different "levels" of legal tax opinions that are in current use for various purposes. See Jasper L. Cummings, Jr., *The Range of Legal Tax Opinions, with Emphasis on the 'Should' Opinion*, Tax Notes, February 17, 2003. The Treasury Regulations define several of these opinion levels. For example, the definition of the "more likely than not" opinion standard is contained within Treas. Reg. § 1.6662-4(d)(2), which states that "more likely than not" is "the standard that is met when there is a greater than 50-percent likelihood of the position being upheld." Somewhere below the "more likely than not" standard are the "substantial authority" standard (Treas. Reg. § 1.6662-4(d)(2)) and the "reasonable basis" standard (Treas. Reg. § 1.6662-3(b)(3)). Other levels of opinions, such as "should" and "will," are defined in various ways by courts and by generally accepted practice. See, e.g., Long Term Capital Holdings v. United States, 330 F. Supp. 2d 122, 145 n. 34 (D. Conn. 2004) ("Tax law practitioners customarily use the wording of a legal opinion to convey their level of comfort that the legal conclusions contained therein are correct as a matter of law assuming the factual representations and assumptions set forth in the opinion are also correct. Different comfort levels are customarily indicated with the language 'more likely than not,' 'should,' and 'will.' A 'should' level opinion evinces a fairly high level of comfort on the part of the tax practitioner that the legal conclusions follow as a matter of law from the factual representations and assumptions.").

- reporting "the net of two figures" on a return, using "a grantor trust . . . that, because of certain features enumerated in the tax code, is disregarded as an entity for federal income tax purposes" (¶ 57(a)).

Treasury Reg. § 1.671-4(b) contains lengthy guidelines about how to report income from a legal entity called a grantor trust. It appears that the indictment alleges an unspecified violation of these reporting rules.

- not obtaining "an independent opinion" as "the law in effect from at least in or about August 1997" required  (¶¶ 27, 40(e)).

This allegation presumably refers to the complex regulatory scheme under I.R.C. sections 6662 and 6664, as these Code sections allegedly read back in August 1997.  The Treasury regulations under these Code sections provided (and still provide) a lengthy set of guidelines for determining whether there was substantial authority for the tax treatment of an item, and whether the reasonable cause and good faith exception to section 6662 penalties should apply.

- using fraudulent investment devices, such as "a purported warrant" (¶ 34); "a purported swap" (¶ 34); "purported foreign currency investments"(¶ 38).

For taxation purposes, each of these types of investments is governed by many I.R.C. sections, and regulations.  See, e.g., Treas. Reg. §§ 1.163-5(c)(2); 1.279-3(d)(2); 1.305-1(d); 1.305-3(d)(1); 1.305-7(b)(1); 1.355-6(c)(3); 1.355-7(e); 1.356-3(c); 1.382-2T(h); 1.382-4(d); 1.421-1(a)(1); 1.543-1(b)(5); 1.721-2(e); 4.954-2(e)(5); 1.988-1(a)(2)(iii).  They are often defined in other federal laws and regulations as well.

- using fraudulent financing devices, such as "falsely described as a 'leveraged' investment program," the "purported loan," and "a sham loan" (¶¶ 38, 40(c), (f))

There are scores of laws and regulations defining financing vehicles and prescribing their appropriate tax treatment in various situations.  See, e.g., I.R.C. §§ 163, 165(g) and (j); 166; 171; 1016(a)(5) (and the Treasury regulations thereunder).  When the IRS argues that a loan should be disregarded for some purpose, its position is governed by detailed case law.

Just for the specific allegations of law in the Indictment, the government must prove that the IRS' proposed application of the law or doctrine is correct; that the investor-taxpayers were intentionally wrong, and that the defendants understood the law and intended to assist the taxpayers in violating Internal Revenue Code sections, Treasury Regulations, and judicial doctrines.  In doing so, the prosecution must establish the clarity and simplicity of what the Treasury Department has itself called "the mind-numbing complexity of the Internal Revenue

Code." Treasury's Enforcement Proposals for Abusive Tax Avoidance Transactions, 2002 TNT 55-28, March 20, 2002. See, e.g., Cheek v. United States, 498 U.S. 192, 200 (1991), 111 S.Ct. 604, 610 (defining willfulness under § 7201 as "voluntary, intentional violation of a known legal duty") (citations omitted); United States v. Pirro, 212 F.3d 86, 91 (2d Cir. 2000) ("Because only willful conduct is criminal under section 7206 and because willfulness requires a voluntary intentional violation of a known duty, the duty involved must be knowable.") (citing United States v. Mallas, 762 F.2d 361, 363 (4th Cir. 1985)) (internal quotations omitted); United States v. Dahlstrom, 713 F.2d 1423, 1428 (9th Cir. 1983) (overturning Klein conspiracy and § 7206(2) convictions because "the legality of the tax shelter program advocated by the appellants in this case was completely unsettled by any clearly relevant precedent on the dates alleged in the indictment. It is settled that when the law . . is highly debatable, a defendant – actually or imputedly – lacks the requisite intent to violate it.") . . . (citations omitted); United States v. Harris, 942 F.2d 1125, 1131 (7th Cir. 1991) (holding that an indictment must be dismissed where "current law on the tax treatment" provided "no fair warning that [defendant's] conduct was criminal" and that "new points of tax law may not be the basis of criminal tax convictions").

From what little we know about the government's proof so far, it will seek to carry this burden with:

1.      emails from within KPMG's Washington National Tax group debating the tax law and its application to each of these issues;

2.      cooperating testimony from an investment banker at a secondary bank who admits to his own embezzlement, tax fraud, and perjury, and then apparently says that loans made by his bank were not "bona fide," did not provide any "leverage," and were not "employed" in the purchase of foreign currency positions; and

3.      one assumes other, unidentified witnesses.

The government has indicated that it will not call any expert witnesses on any topics, such as the state of the tax law in 1999, how the forward currency investments worked, or how the financing works. Sager Decl., Exhibit F (October 5, 2005 letter), at 4 ("At this time, the government does not anticipate offering testimony during its case-in-chief pursuant to Federal

Rules of Evidence 702, 703, and 705.").

### B. **What The Defense Will Establish**

By the defendants' 19 not guilty pleas to the entire conspiracy, one can expect that the defense will contend that the tax positions the taxpayers took were legal and appropriate under the various IRS statutes and regulations relevant at the time. The defense will show that the alleged coconspirators believed the tax treatment and investments were appropriate, both from their own experience on any issue in which they had expertise, and on the collective expertise of the many experts considering the investments. Furthermore, the defense will show that the whole range of alleged coconspirator participants in the transactions believed the investments and the tax treatment of those investments were appropriate under the law at the time – and that includes the accounting firms' tax departments, the various investment advisors and law firms considering the issues, and the sophisticated investors (along with their professional tax and investment advisors). This is no great revelation – it should be entirely expected by the government, knowing that this is a specific intent regulatory indictment, and having received Presidio's BLIPS civil summary judgment motion.

Obviously, then, when the prosecution attempts to counter the evidence of the defendants' good faith beliefs in the tax treatments and the investments, it will have to disprove the credibility and reasonableness of the defendants' good faith beliefs. If it does not, the case is over.

### C. **The Government Discovery Provided So Far**

The disclosures by the government amount to an 8-million-plus page dump of bank records, deal documents, personal files, and tax returns. The government cites the volume and completeness of the discovery (one person's completeness is another's disorder) to support its assertions that the prosecution has exceeded its disclosure obligations. Yet nowhere in that warehouse or on the dozens of computer databases is the most critical evidence relating to the

defendants' lack of specific intent to violate clear tax laws.  Hence, we must bring this motion.

## III.     THE GOVERNMENT SHOULD BE ORDERED TO COMPLY WITH ITS DISCOVERY OBLIGATIONS

### A.  The Government's Disclosure Obligations

#### 1.   The Rule 16 Obligation to Disclose Evidence Material to the Defense

Federal Rule of Criminal Procedure 16 requires the government to permit a defendant access to documents and other information within the "government's possession, custody, or control" if they are material to preparing arguments in response to the government's case-in-chief.  Fed. R. Crim. P. 16(a)(1)(E)(i);  United States v. Armstrong, 517 U.S. 456, 462 (1996), 116 S.Ct. 1480, 1485.  A document is material if "it could be used to counter the government's case or to bolster a defense."  United States v. Stevens, 985 F.2d 1175, 1180 (2d Cir. 1993); United States v. Rigas, 258 F. Supp. 2d 299, 306 (2d Cir. 2003) (denying motion to compel discovery of legal and accounting documents because not material to defense).

The standard for disclosure is not a restrictive one.  For example,

> [T]he documents need not directly relate to the defendant's guilt or innocence.  Rather, they simply must play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony or assisting impeachment or rebuttal.

United States v. Rezaq, 156 F.R.D. 514, 519 (D.D.C. 1994) (citations omitted); United States v. George, 786 F. Supp. 11, 13 (D.D.C. 1991) (noting that the hurdle of showing that documents or evidence sought to be discovered are material to the preparation of the defense "is not a high one").

Below, we describe in considerable detail the types of information which is material and favorable to the defense, and our evidence indicating that it exists.  This showing is sufficient to obtain an order requiring production.  See, e.g., United States v. Giffen, 379 F. Supp. 2d 337 (S.D.N.Y. 2004), United States v. Witt, 1982 U.S. Dist. LEXIS 1474 at *4 (S.D.N.Y. Sept. 13, 1982) (noting that "the heart of the holding in Brady is the prosecution's

suppression of evidence, in the face of defense counsel's request, when the evidence is favorable to the accused and is material to the determination of guilt or to the appropriate punishment") (citations omitted); See Sager Declaration Exhibit H.

2.   The Brady Obligation to Disclose Evidence Favorable to the Defense

The government must disclose to the defendant all "evidence . . . material either to guilt or to punishment." Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1197 (1963). This obligation is rooted in the Due Process Clause of the Fifth Amendment. Id.; United States v. Agurs, 427 U.S. 97, 107, 96 S. Ct. 2392, 2399 (1976).

The government must "disclose evidence if, without such disclosure, a reasonable probability will exist that the outcome of a trial in which the evidence had been disclosed would have been different." United States v. Coppa, 267 F.3d 132, 142 (2d Cir. 2001); United States v. Gleason, 265 F. Supp. 880, 886 (S.D.N.Y. 1967) ("[T]he prosecution's duty of disclosure as affirmed in Brady, cannot be limited to materials or information demonstrated in advance to be 'competent evidence.' . . . The duty surely extends to favorable information unknown to the defense . . . ."); see also United States v. George, 786 F. Supp. at 13 . "The prosecutor, however, cannot await the outcome and must therefore make a prediction before the trial as to how the nondisclosure of favorable evidence will be viewed after the trial." Coppa, 267 F.3d at 143. The government is required to make a "careful prediction" as to "when the point of reasonable probability is reached." Coppa, 267 F.3d at 143 (citations omitted). When the government guesses wrong, judicial relief is warranted. Id.; Boyette v. Lefevre, 246 F.3d 76, 91-93 (2d Cir. 2001) (reversing conviction because of suppression of material that could have helped the defense). As the court in United States v. Wood, 57 F.3d 733, 737 (9th Cir. 1995) explained:

> The [Brady] duty arose from the unfairness of the government prosecuting a person on a criminal charge while keeping as a secret to itself material that might exonerate him. It is a duty that assumes that the government's aim in a criminal trial is not victory but justice.

Finally, the government must also disclose Brady material in time for its effective

use at trial. <u>Coppa</u>, 267 F.3d at 146. A constitutional violation occurs if defendants are not afforded sufficient opportunity to use the material, such as undertaking further investigation to discover specific exculpatory information. <u>Leka v. Portuondo</u>, 257 F.3d 89, 100-02 (2d Cir. 2001) (reversing conviction because delayed disclosure to defense of key witness, who was identified nine days before opening arguments and 23 days before the defense began its case, constituted suppression under Brady). "The opportunity for use under Brady is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought." <u>Leka</u>, 257 F.3d at 103.

Rule 16 and <u>Brady</u> require production of evidence either that the government has reviewed or to which it has access. The government cannot draw artificial lines between its prosecution team and the rest of the government. "Documents that the Government has reviewed or has access to must be provided to aid a defendant in preparing his defense." <u>Giffen</u>, 379 F.Supp.2d at 343 (ordering that the government produce all documents that it had access to, including documents held by the CIA and the Department of State) (citing <u>United States v. Santiago</u>, 46 F.3d 885, 894 (9th Cir. 1995)). As the Supreme Court stated in <u>Kyles v. Whitley</u>, 514 U.S. 419, 437, 115 S. Ct. 1555, 1567 (1995), "the individual prosecutor has a duty to *learn* of *any* favorable evidence known to the others acting on the government's behalf in the case, including the police." <u>Id</u>. (emphasis added). <u>See also</u>, <u>United States v. Wood</u>, 57 F.3d 733, 737 (9th Cir. 1995) (<u>Brady</u> violation in failure to disclose exculpatory material contained in FDA reports because FDA charged with administering statute at issue and consulted with prosecutor in steps leading to prosecution). We note that the government has never denied that any of the requested material exists.

Against this backdrop, we will now explain how critical our discovery requests are, attempting to group 19 requests into a few categories.

**B. Information Regarding Taxpayers and Investors**

Items 4 and 10 of our discovery letter relate to favorable defense information that

the government has obtained from taxpayers and investors in the BLIPS, OPIS, FLIP, SOS, and Son of BOSS investigations.  For example, we have requested the names and addresses of all investors (and their professional financial, tax and accounting advisors) who have provided favorable or exculpatory information, the details of that information, and any evidence that contradicts or is inconsistent with the indictment's portrayal of the investor's engagement of KPMG, Presidio, or Brown & Wood; the investor's motivation to participate in the investment strategies; the investor's expectation regarding the profit potential of the strategies; or the duration of the investor's participation in the strategy.  Sager Decl., Exhibit A.  These materials are plainly material to the defense.

1.    Taxpayer and Investor Evidence Is Material to the Defense

Did any of the prominent taxpayers who made these investments – and signed tax returns under penalty of perjury – tell the government that he or she believed the tax treatment was appropriate and "more likely than not" to prevail against a government challenge?  Common sense would indicate that maybe hundreds of taxpayers have told this to the government.  Indeed, how many people would immediately agree with the government's theory that the tax law is clear and that the return was intentionally fraudulent?  Not many, we submit.

We expect that the government's complete audit files and interview reports and notes are full of evidence that sophisticated investors carefully considered their multi-million dollar investments, received advice from their own separate tax advisors, accountants, and investment advisors, and concluded that the tax position they took under written oath was appropriate under the IRS's own regulations:  that is, more likely than not to prevail in court.  The files and notes will show which issues they especially considered, what their advisory team's analysis was, and to whom they spoke with (at KPMG or elsewhere) about those beliefs.  Any time a sophisticated investor (or his advisors, accountants or law firms) indicates that he or she believed the investment program made sense and could make money, or passed the amorphous, judicial "economic substance doctrine," or that the Brown & Wood or KPMG legal

opinion made sense, it shows that Presidio's economic program was appropriate, that it was reasonable (and correct) for the Presidio defendants to rely on the tax professionals' opinion letters, and that the defendants are credible when they say that they certainly did not intentionally break the tax laws of this country.

Statements by these investors and their representatives, and related documentation obtained by investigators, is critical evidence directly contradicting the core of what the government must prove. The government cannot avoid this discovery obligation by its current contention that the element of tax due and owing is immaterial since the taxpayers have allegedly paid their taxes. The taxpayers who signed allegedly false tax returns are alleged coconspirators in the indictment. When investors are interviewed by IRS criminal or revenue agents, or when they or their lawyers meet with the prosecution team in New York, if they say that they believed the investments were legal, that the tax treatment works, that any of the tax issues we describe above in Section II.A have not been violated, then that is compelling defense evidence. The position itself tends to show there is no specific intent. Their analysis provides leads to the defense to other documents and witnesses to support the statements. The taxpayers and their advisors are potential defense witnesses. Surely, this evidence meets the Rule 16 materiality and constitutional "helpful to the defense" standards.

The government's response misses the point:

> The fact that, unknown to your client, other individuals held or did not hold certain beliefs does not bear on your client's mental state. To the extent any such third parties shared these beliefs with your client, you are in as good a position as the Government to investigate those matters and offer the evidence, to the extent it is admissible and exculpatory

Sager Decl., Exhibit G (December 22, 2005 letter). This is wrong for many reasons:

First, the fact that sophisticated investors and advisors came to the same conclusion as the defendants on complicated tax and investment issues shows that the positions are credible, reasonable, and made in good faith, as described above. This applies to every issue in the case, be it, for example, the Argentine Peso's odds of devaluing (relevant to BLIPS), the

likelihood of a run-up in the stock price of UBS and Deutsche Bank in 1998 (relevant to OPIS), the economic substance doctrine's application, the leverage and loan program's reality (not a sham), or the "more likely than not" prediction of future litigation results.

Second, evidence that these investors acted consistently with this belief or told others about it is circumstantial evidence that they shared these beliefs in good faith. Which investors conveyed these beliefs to which defendants or to which unindicted coconspirators? The fact that former government officials, relatives of prominent public figures, and some of the giants of American business invested in these programs bears both directly and circumstantially on the intent of every defendant. If this kind of information was conveyed to any alleged conspirator, it is compelling defense evidence. If it is told after-the-fact to the government, it certainly makes it more likely that the investor held that belief earlier, that the defendants or unindicted coconspirators held that belief earlier in good faith, or that they said as much to the investor.

Third, the government cannot avoid a disclosure obligation by alleging that the defense must conduct a parallel instigation. If the government has knowledge and possession of the information – e.g., the investor told the prosecutor or the agent that the premium loan probably is not a liability when contributed to a partnership – then that must be disclosed. The Constitution and the Federal Rules do not permit the government to conceal evidence it has by simply telling 19 individuals (without investigative subpoena power or the IRS budget) to replicate a multi-year, multi-agency, massive government investigation. See United States v. Sternstein, 596 F.2d 528, 531 n. 6 (2d Cir. 1979) (in remanding conviction under § 7206(2), required district court to review under Brady IRS report analyzing "an exceedingly large number of tax returns" and taxpayer interviews because "[t]he information was not independently available to appellant" and the court was not satisfied that "a brief perusal of the document . . . would have been sufficient to enable counsel to distill from the report of an extensive investigation all the particulars pertinent to [defendant's] defense."); Witt, 1982 U.S. Dist. LEXIS 14741, at *8 (in indictment alleging a "long-term and far-flung [health care sham], involving a number of physicians, hundreds if not thousands of patients, and thousands upon

thousands of prescriptions," required disclosure of patients and physicians referred to in the indictment or referred to in the government's proof who (1) would not be called as government trial witnesses, (2) were interviewed by the government during the investigation, and (3) made exculpatory statements negating defendants' mental intent) (Sager Decl., Exhibit H.)

Fourth, if the government is truly taking the position that taxpayer, investor, and other third party acts and statements about the investments are immaterial, we certainly should not see any of those people as government witnesses at trial, nor should any of their documents be offered into evidence. If the government confirms this position in its pleadings, we expect the defense will file motions to strike and to dismiss.

2.   The Evidence Exists

In this case, we have a rare situation where the common sense analysis of what the government must have in its possession actually can be proven. Below are two instances of evidence that is material and favorable to the defense, but apparently is being withheld by the government. We learned about these not from the prosecution team in this case, but through IRS sworn testimony and through third-party civil discovery.

The first example comes from an IRS designated representative's sworn testimony in civil litigation brought by Presidio to establish that investors' BLIPS tax treatment was appropriate. Before the government obtained a stay in that case, the District Court ordered the government to present a Rule 30(b)(6) witness (over the government's objections and motions).

In that June 28, 2005 deposition, the IRS revealed that it had interviewed one BLIPS investor in its years of investigating BLIPS. That investor told the IRS that he believed that the BLIPS investment had economic substance and a reasonable possibility of making a profit. The IRS apparently disbelieved him. Sager Decl., Exhibit I, Deposition of IRS Rule 30(b)(6) representative Robert Gee, June 28, 2005, at 74-78.

In the federal action, the government did not provide any more details about that testimony (e.g., why the investor believed the investment had economic substance, who advised

him, what was the rest of his tax law analysis, with whom did he discuss this (Presidio? KPMG?)). It did not produce any transcripts, reports, or relevant documents. To the contrary, sometime after that interview, the criminal prosecutors instructed the civil investigators to cease investor interviews. Id. at 233-34.

Thus, of the dozens or hundreds of BLIPS investors who have communicated with the IRS, we have information about just one such contact. And we know that *one out of one* investor interviewed has provided material, exculpatory information which, as far as we can tell, has still has not been produced by the prosecution team. It sits hidden somewhere in a government file.

Second, we know of a similar example regarding the OPIS investment (¶¶ 34-37) because of a civil lawsuit. In response to an IRS Information Document Request, a millionaire investor wrote a letter to the IRS describing the significant profit potential he believed existed in the OPIS investment strategy. The IRS, in the analysis incorporated into the investor's Form 4549A, Income Tax Examination Changes, relied on the investor's good faith assessment of profit potential in deciding not to assess accuracy-related penalties on the transaction. In the interests of caution, we are not submitting this document or identifying the investor because of a protective order in that civil case. Furthermore, the investor's lawyers refused to consent to our disclosing these documents to any defendants in this case, or to present it to the Court in any manner other than under seal. (We will make such an under seal application shortly.) So while this type of exculpatory material exists, and we were able to discover it through sources other than the prosecution, defendants are not able to effectively use it in their defense.

This evidence shows that Presidio's belief in the OPIS investment program and in KPMG's and Brown & Wood's proposed tax treatment was reasonable. The defense has not yet found this document anywhere in the eight million pages of discovery. What is the rest of the correspondence? What other OPIS investors have also represented to their government that they and their advisors hold the same views that the government says are intentional lies? This is core evidence negating *mens rea* for the defendants. Furthermore, if the taxpayer believes his return is appropriate, there is no crime of tax evasion for a defendant allegedly to cause or to aid and

abet.  As in the BLIPS case, here *one out of one* OPIS investors that Presidio has deposed has provided favorable defense material to the government which has not been disclosed by the prosecution in this case.

It is certainly reasonable to expect that the investors interviewed and subpoenaed by the prosecution team, and the statements and depositions the government obtained from KPMG and other sources, contain much more exculpatory evidence.  And the prosecution has not denied that this evidence exists – it has only asserted that it is not material to the defense. We urge the Court to order the material disclosed.  Then, the Court and the jury can decide whether the evidence disproves *mens rea* – not the government.

## C.  Statements And Positions By IRS Professionals

### 1.  Internal and External Statements by IRS Professionals Are Material

The government has denied each of our requested items relating to statements by IRS and other professionals.  The government apparently believes its key evidence are emails showing discussion among KPMG professionals concerning the technical tax rules relating to these investments written before its Washington National Tax Department concluded that it was "more likely than not" that the investments would succeed over a (still unresolved) IRS challenge.  The indictment even quotes several of these emails.  Just as one should expect in the course of such discussions and professional debate, we expect that IRS professionals have discussed and debated the merits of the taxpayers' positions regarding these investments.

If discussions within KPMG about tax and investment issues are alleged to be admissions if someone asserts the minority view, then isn't it material to the defense to know about the IRS's professional discussions about the merits of the taxpayers' positions?  If an agent states that the premium loan tax treatment may very well work as claimed by the accounting and law firms' tax departments, or if an agent agrees with a prominent investor that the economic program makes sense, or if an IRS analyst expresses concern that the economic substance test provides a horribly vague basis for a criminal prosecution, that tends to show that the defendants'

beliefs are correct, reasonable, and held in good faith.  Put another way, if an IRS professional assigned to OPIS stated that the investor's tax position very well might prevail if challenged in court, that would be directly consistent with the defense, and directly contradictory to the government's specific intent proof obligation.

### 2.  The Evidence Exists

Why do we suspect that the government is withholding this type of evidence? There are several reasons:

First, most broadly, the Tax Code interpretation issues are remarkably complex. It requires interpreting dozens of tax code provisions and their related regulations and case law. The accounting and law firm teams worked on the tax issues for months in the BLIPS investment alone, and it took 96- and 88-page opinions to describe the analysis.  We described earlier the complicated tax issues specifically alleged in the indictment.

Given this complexity, it is hard to imagine that when hundreds of investors interact with dozens (or hundreds?) of IRS professionals, there are not some discussions within the IRS about the technical arguments or the economics of the investments.  Anyone approaching in good faith the tax effects of the Section 752(b) treatment of premium loans -- or the contingent loss provisions, or the corporate stock redemption regulations, or the tax shelter registration rules -- is bound to have concerns and issues with any proposed tax treatment.  If there is no discussion, debate, and disagreement before reaching a final position on all of these issues, something is wrong with the analytical process.

Second, at the more specific end of the spectrum, we strongly suspect that there was discussion within the IRS concerning both BLIPS and OPIS on whether or not the IRS could prevail in a challenge in the court system.

On BLIPS, the IRS took the remarkable step of issuing in 2003 a temporary, retroactive regulation aimed at the BLIPS transaction (it mentions Notice 2000-44 in its provisions), deeming that the contributed premium loan does not entitle the taxpayer to favorable

treatment.  Temp. Treas. Reg. § 1.752-6T.

The question is, if the law is so clear that BLIPS does not work, why did the IRS issue a retroactive regulation?  This question is particularly urgent in light of the fact that the retroactive regulation exceeds the mandate of the purported authorizing statute, Code section 358(h).  Temp. Treas. Reg. § 1.752-6T was issued pursuant to Congress's delegation of power to Secretary of the Treasury to make regulations under Code § 358(h) that would apply to partnerships "to prevent the *acceleration or duplication of losses* through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) . . . ."  P.L. 106-554, § 309(c)(1)(emphasis supplied).

(Here, two flaws in Temp. Treas. Reg. § 1.752-6T(b)(2) become immediately apparent, showing how far the IRS was stretching to save its tax position on BLIPS.  First, the premium portion of a loan is simply not a "liability" under Code § 358(h) – therefore the Treasury's attempt to address it in a regulation purportedly promulgated under Code § 358(h) goes beyond the statute.  Second, the BLIPS-like transactions attacked in Notice 2000-44 do not accelerate or duplicate losses – they create the potential for a loss when the partner disposes of his partnership interest (or an asset that has the same basis), but that is not acceleration of a loss that would have otherwise have been taken later, or duplication of a loss taken by the partnership itself.  If Congress wanted to grant the Treasury authority to promulgate regulations to prevent the *creation* of losses, it could have done so; but, that is not what the explicit delegation of rulemaking authority provides in P.L. 106-554, § 309(c)(1).)

Given that the Treasury plainly exceeded its regulatory authority under Code section 358(h), there must have been substantial discussion within the IRS regarding whether the temporary, retroactive regulation was appropriate and necessary.  Ultimately, the IRS apparently concluded that the text of the previous law was either unclear or led to a result the IRS did not like, because they issued the temporary, retroactive regulation.  Surely if the IRS concludes the existing law is unclear or even provides capital gain relief to a taxpayer, it helps show that a defendant's belief in the BLIPS tax treatment was held in good faith.

On OPIS, we expect that the IRS debated and ultimately decided to initiate a

settlement program in which taxpayers were awarded 20% of their claimed tax losses, plus a

deduction for the costs of the investment.  I.R.S. Notice 2002-97, 2002-2 C.B. 757.  Surely there

was discussion within the IRS regarding why it would pass up millions and millions of dollars of

tax revenue.  The likely reason, of course, is that the IRS concluded that there was a significant

risk that a court might find the OPIS tax treatment was entirely appropriate.  As this evidence

comes to light, the prosecution will have a difficult time establishing that the "more likely than

not" tax opinion – alleged as a fraud – was intentionally fraudulent.

   Third, the government does not deny that this information is out there.  In

response to our request, the prosecution carefully writes:

> . . . we do not believe that such materials (assuming they exist and
> are in the custody or control of the prosecution team) would be
> subject to disclosure . . . .

Sager Decl., Exhibit G (December 22, 2005 letter).  To the contrary, we know for a fact that the

government first produced and then retrieved reams of IRS material before the defense could

review it.  The government has had teams of agents working full-time at the Queens warehouse

removing documents.  This document withholding project was underway before our hearing last

October 24, 2005 (where the prosecutor mentioned it as proof that the documents were

accessible and manageable, since the agents had been there removing documents that week).  It

was also underway in late November, when a defense group was unable to review dozens of

boxes of documents because the government's retrieval team was working through them.  See

Sager Decl., Exhibit A.  And finally, we received a letter from the prosecution on November 30,

2005 instructing us not to review an entire database we had already paid for and obtained

because it contains these materials.  Sager Decl., Exhibit J (November 30, 2005).

   In addition to withholding the documents, the government has refused to provide

us with any privilege log.  The theory, apparently, is that the documents are not material, so no

privilege claim is necessary.  This tactical play leaves us arguing about documents without even

knowing the authors, dates and subjects of the materials.  We request production of a privilege

log of any documents being withheld from the defense because they are IRS or other government

agency documents, including all documents retrieved from the Queens warehouse and the documents in the database we have been asked not to review.

**D.** **Statements and Positions By Others Involved In These Investments Or In Similar Investments**

It was well-publicized that the government began the public criminal investigation with "subject letters" to 30 KPMG professionals, and a request for interviews. Motions by other defendants reveal how KPMG's new policy acted to pressure subjects to consent to interviews. It would not be surprising if this criminal investigation team has interviewed hundreds of persons related to these investments, and met with representatives of dozens of accounting firms, law firms, and investment firms. It seems to be a safe inference that many (perhaps all) of these persons have denied any intentional tax evasion regarding these investments. If these persons and entities lacked the necessary *mens rea*, that evidence indisputably tends to support that the 19 charged defendants had reasonable beliefs in the validity of the investments. Evidence from these persons could explain why the tax treatments were appropriate, why the internal review processes were appropriate, how other accounting firms and law firms concluded that the tax treatment was lawful, and on and on. In fact, KPMG mounted a spirited defense of the civil cases for years and apparently took months and months to reach a settlement agreement with the government. If KPMG's representatives told the government that there was no crime here and explained why, that is mainstream exculpatory evidence for its employees. See Witt, U.S. Dist. LEXIS 14741, at *14 (granting disclosure of exculpatory evidence relating to employees who were originally targeted in the investigation of an alleged health care sham, but were regarded as favorable trial witnesses as the result of plea bargaining and cooperation agreements) (Sager Decl., Exhibit H); United States v. Sudikoff, 36 F. Supp. 2d 1196, 1202 (C.D. Cal. 1999) ("Because [the process of negotiating a leniency agreement] can be lengthy and because it often carries some of the typical negotiating give-and-take, it is possible, maybe even likely, that the witness's proposed testimony that was proffered at the beginning of the process differed in some respects from the testimony proffered at the end of the process.").

Another example is the government's disclosed cooperating witness, HVB banker Dominic DeGiorgio. Some theories from his guilty plea have been exported directly into the indictment. Does the government have any evidence contradicting these theories? One expects that DeGiorgio or his counsel may have provided exculpatory evidence at some point before agreeing to the embezzlement plea arrangement. Indeed, it is a matter of public record that DeGiorgio swore both orally and in writing to the United States Senate in a manner directly contrary to his guilty plea allocution. What about his employer or his co-workers? Have they all consistently informed the government that, for example, the HVB loans were a sham and that everyone knew and intended them as such? More likely, they have disputed and continue to dispute these assertions, and have provided evidence to the contrary. That evidence is not just impeachment; it directly contradicts the allegations and the theory of the indictment.

Finally, it is not just the KPMG BLIPS investment program that relates to Section 752(b) assumption of liability provisions. The IRS Notice addressing BLIPS also addresses the so-called Son of Boss alleged tax shelters, for which we are unaware of anyone pleading guilty to tax evasion. This means that sitting in the government's files is a parallel set of audits, IRS discussions, interview notes, and other information discussing concepts central to the BLIPS transaction. Presumably, there is evidence there showing that many, many other professionals and experts agree with the tax opinion's interpretation of those provisions. Likewise, OPIS is just one of many basis-shifting transactions the corporate stock redemption transactions that the IRS has challenged over the years. For example, in 2003 it was reported that the IRS was challenging Seagram's tax treatment of its Dupont stock redemption in the now-famous 1995 Seagram-Dupont transaction. See Willens, *IRS Challenging Tax Characterization of Seagram's Dupont Stock Redemption,* BNA Daily Tax Report No. 101, at J-1 (May 27, 2003).

Other investment and accounting firms had similar investment programs underway. If those participants have indicated that they believe the tax treatment is appropriate and why, that is favorable evidence to these defendants.

### E. Privilege Logs And Statements Of Documents Withheld

The government has also refused to disclose privilege logs provided to the government by third parties, or evidence of agreements to limit production of documents. When the prosecution hopes to fulfill its discovery obligations by purportedly giving the defense all of some kinds of documents, the defense should be entitled to learn what that means. If there are 30 boxes of documents in Queens from a investor or a bank, the defense does not know if anything was withheld on privilege grounds or by some agreement with the government. If the third party provided a privilege log, we would like a copy. If there was an agreement limiting production, we would like to review that agreement. Otherwise, the defense does not know what it has and what it might be missing in the huge production.

Along those same lines, the defense has no idea if the documents produced represent the complete set of documents obtained by the government. Did the government obtain privileged documents from any entity or person, and then return those documents or withhold them from production to the defense on privilege grounds? Under waiver laws, the defense is entitled to those documents. Providing a privilege log to the defense would be the first step in the defense understanding exactly what has been produced and what has not. If nothing has been withheld on privilege grounds, of course, the government could simple say so.

## IV.    CONCLUSION

Last, we ask what is the interest in justice in the government's withholding all of this evidence? If the government withholds this evidence today, someday it will probably get out – maybe through a FOIA request, or a civil case, or an IRS agent's memoirs. It would be an awful tragedy for everyone associated with this case if these defendants were tried and convicted, their lives ruined, and only then did the real evidence see the light of day. If this is indeed the tax fraud of the century and these professionals the worst tax evaders in history, surely the government's case can withstand allowing both sides to see all of the evidence.

For the foregoing reasons, defendants Larson and Pfaff move for an order generally requiring the government to disclose all Brady and Rule 16 defense material within 14 days, and specifically, to produce the 19 categories of evidence described in the accompanying

proposed order.

## MOTION FOR BILL OF PARTICULARS

**I.    INTRODUCTION**

Defendants John Larson and Robert Pfaff join the motions for bills of particulars of the other defendants in this case.  We also request a handful of additional items:  (1) a list of the taxpayers, designation of their allegedly false tax returns, and an itemization what the government contends is "phony" about those returns; and (2) a designation of exactly what Senate testimony by John Larson was allegedly false.  The prosecution has refused to answer these two inquiries.

To the prosecution's credit, it did reveal that its method of proof on all tax charges will be specific item, and that it contends that the traditional tax evasion element of proof of tax due and owing is not in dispute because taxpayers have paid their taxes to the IRS.  In light of these disclosures, we do not understand why the government will not respond to our two unanswered items.  In the interests of fairness, we ask that the Court order a bill of particulars on these two topics so that the defendants can know the allegations and efficiently prepare for trial.

**II.    THE COURT SHOULD ORDER THE GOVERNMENT TO RESPOND TO OUR REMAINING PARTICULARS**

**A.  Summary of Facts**

In paragraphs 29 through 32 of the indictment, the government alleges that "at least" a total of 601 "wealthy individuals" filed tax returns with "at least" a total of $11.2 billion of "phony tax losses."  By charging the defendants in this conspiracy, the government has alleged that each of these persons committed willful tax evasion and tax fraud in their returns. Other than these large number allegations, the indictment provides no more detail about these hundreds of alleged criminal coconspirators or their returns (other than the somewhat cryptic allegations in the table at pages 64 to 66 concerning 18 taxpayers) .

In paragraphs 63 and 78(yy) of the indictment, the government alleges a perjury-like charge against defendant John Larson, but qualifies that allegation with the lawyerly "among

other things."

> LARSON also provided false and misleading testimony by, **among other things**, falsely denying that BLIPS was designed so that investors would exit on day 60 of the transaction regardless of the purported 7-year structure of the purported loan, and falsely denying that FLIP was designed primarily for tax deductions.

Indictment at ¶ 63 (emphasis added).

The defendants sent the prosecution team a letter inquiring about these topics and others. Sager Decl., Exhibit K (December 22 letter). The prosecutors responded with a telephone call which the defense confirmed by letter. Sager Decl., Exhibit L (January 7, 2006). The government did not respond to the two remaining requests that are the subject of this motion.

Many of these charges involve tax returns that defendants Larson and Pfaff have never seen. They did not participate in and have no knowledge of the SOS transactions. Since different taxpayers apparently reported their investments in different ways on their Form 1040, including stating losses on different lines of the forms, it is critical to defendants Larson's and Pfaff's defense to know which items the government contends are false. And since there is no allegation that Mr. Larson and Mr. Pfaff ever prepared or reviewed any of these hundreds of tax returns, their review of the allegations against them must start from scratch.

The government's response is inadequate to apprise defendants Larson and Pfaff of the charges against them, so defendants ask the Court to order the government to file a bill of particulars regarding these matters.

## B.  A Bill of Particulars Is Appropriate

### 1.  Defendants Have Met the Standard for A Bill of Particulars

A bill of particulars is appropriate to permit a defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be

prosecuted a second time for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). In deciding whether to order the government to produce a bill of particulars, the Court should consider the complexity of the offense, the clarity of the indictment, and the available discovery. United States v. Walker, 922 F. Supp. 732, 739 (N.D.N.Y. 1996). In complex conspiracy cases like this one, courts have granted bills of particulars to provide further information about the acts involved in the conspiracy. See, e.g., United States v. Taylor, 707 F. Supp. 696, 700 (S.D.N.Y. 1989) (granting a motion for a bill of particulars in a drug conspiracy case because it was "necessary to the preparation of the defendant's defense").

This information requested is necessary in order for defendants Larson and Pfaff to prepare for trial and to prevent surprise. Surely this information is readily known to the government, since it asserts that the element of tax due and owing is not in dispute because the taxpayers have paid their taxes. Without more particularity as to which investors committed tax fraud and tax evasion, and which line or lines on the Form 1040 the government contends is false, and the "phony tax loss" calculation for each alleged act of evasion, the defendants will have to: (a) recreate the government's investigation and analysis of the tax returns by canvassing the 8 million pages of discovery, and (b) hope that we reach the same results as the government did. Thus, even after a huge expenditure of time and resources, the defense cannot be sure that it will come up with the same list of taxpayers and the same tax return analysis as the indictment references. The task is made all the murkier by the indictment's qualifying each number with "at least" and "approximately." Since there is no allegation that defendants Larson and Pfaff ever saw any tax returns other than their own – or that they know anything at all about "SOS" – the task is hopeless.

A bill of particulars on this issue of tax loss is especially warranted in light of Blakely v. Washington. In Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), the Supreme Court proclaimed that the Sixth Amendment requires the government to prove to a jury beyond a reasonable doubt all allegations that support the requested sentence. In order to defend themselves, defendants need more information from the government than presented in this indictment as to the precise facts it will prove to establish defendants' criminal liability. See id.

at 298-299, 2534-35 (guilty plea that did not have facts supporting "deliberate cruelty" sentencing enhancement violates Sixth Amendment; plea only admitted to "the elements of second-degree kidnapping and the domestic-violence and firearms allegations, but no other relevant facts."); Apprendi v. New Jersey, 530 U.S. 466, 469, 120 S. Ct. 2348 (2000) ("None of the counts referred to the hate crime statute, and none alleged that Apprendi acted with a racially biased purpose," therefore in pleading, defendant did not admit to facts supporting enhancement, so the resulting enhanced sentence violated due process); United States v. Crosby, 397 F.3d 103, 108 (2d Cir. 2005) (noting that Blakely implicates the federal sentencing guidelines).

For some of the same reasons, a bill of particulars regarding the allegations of false and misleading testimony by John Larson is appropriate. Surely the government knows what they have intended to charge. No amount of work or analysis by the defense will enable it to say with certainty what the scope of the allegations are. If the allegation "among other things" means something, it does not harm the government to reveal what that is. If, instead, the allegation is a legalism designed to give the government flexibility in its proof at trial, it seems that fairness requires that the government commit to exactly what allegations it will seek to prove.

2. The Discovery Does Not Reveal the Requested Information

The shortcomings of the allegations in the Indictment cannot be relieved through the discovery process. First, no amount of discovery will definitely reveal the specific tax position that the government claims is illegal, identify which tax return entry is relevant, or reveal the government's theory of the case. Second, even if discovery could provide some guidance on the government's theory, the unworkable manner by which the government has dumped 1300 boxes and over 400 gigabytes on defendants has crippled defendants' ability to review the government's discovery materials. The defendants' ability to analyze the discovery and formulate a defense will be unduly burdened.

While discovery in some cases may obviate the need for a bill of particulars, this is not such a case. In United States v. Bortnovsky, , the court held that it was improper for the

government to simply turn over documents without identifying which of those documents were fraudulent.  820 F.2d at 574-75. Simply turning over documents without identifying the fraudulent ones "hindered [the defendants] in preparing their defense" and thereby "forced [the defendants] to explain the events surrounding eight actual burglaries and to confront numerous documents unrelated to the charges pending.  In effect, the burden of proof impermissibly was shifted to appellants."  Id.  Similarly, the government here has not fulfilled its discovery obligation by merely providing "mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified."  Id. At 575. The government should remedy this situation by supplementing the indictment with particularized information.

In fairness, we cannot say for certain that there is not some schedule or spreadsheet that answers our inquiry buried in the Queens warehouse or in those multi-million page database.  If there is, we request an order requiring the government to identify it.

Furthermore, we have not uncovered any individual tax returns related to FLIP or OPIS at all.  And we would not recognize a return related to SOS if it was sitting on the table in front of us.  As it stands right now, providing the discovery has not and will not solve the problem.

## III.   CONCLUSION

For the foregoing reasons, defendants John Larson and Robert Pfaff respectfully request an order requiring a bill of particulars.

## MOTION TO DISMISS COUNTS TWO THROUGH FORTY FOR LACK OF VENUE

## I.      INTRODUCTION

Defendants John Larson and Robert Pfaff join the motions to dismiss for lack of venue of the other defendants.  The indictment alleges that more than 600 fraudulent and evasive tax returns were filed by individual taxpayers throughout the country, but it fails to allege what, if any, relationship the individual tax evasion counts have with the Southern District of New York.  The Indictment fails to allege that the tax returns at issue were prepared, signed, mailed, or filed in the Southern District of New York, or that the taxpayers themselves had any contact with the forum.  Since the Indictment does not specify who the principals are and who the aiders and abettors are in each count, it is impossible to deduce what affirmative acts the government contends are relevant to establishing venue for each count.  On its face, the indictment does not meet its burden in establishing venue.  On that basis, we respectfully request that the Court dismiss counts two through forty of the present indictment.

## II.     THE INDICTMENT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE VENUE

### A.  Proper Venue Is A Constitutional Right

The Sixth Amendment of the Constitution provides that the accused in a criminal prosecution has the right to be tried in the "district wherein the crime shall have been committed."  See also Fed. R. Crim. P. 18.  The government must show that venue is proper as to each count and each defendant by a preponderance of evidence.  United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1888 (2d Cir. 1989) (reversing convictions on FDCA counts because prosecution violated defendants' constitutional venue rights); United States v. Ramirez, 420 F.3d 134, 139 (2d Cir. 2005) (reversing convictions of visa fraud and mail fraud because venue was not proper).  Further, "the venue potential in a conspiracy case for the prosecutor to choose from is narrowed by the substantive counts the government wishes to prosecute."  United

States v. Saavedra, 223 F.3d 85, 89 (2d Cir. 2000).

A violation of 26 U.S.C. § 7201 is a "continuing offense" within the meaning of 18 U.S.C. § 3237(a).  United States v. Slutsky, 487 F.2d 832, 839 (2d Cir. 1973) (holding venue proper when defendant prepared and signed returns in the district).  Where the offense charged is a "continuing offense," 18 U.S.C. § 3237(a) provides that venue is proper in any district in which the offense was "begun, continued, or completed."  Ramirez, 420 F.3d at 139 ("Although the Supreme Court has recognized Congress's power to define offenses as continuing, it has been wary of extending that label too broadly.").  Venue is proper in any district where an affirmative act constituting an "attempt to evade" was begun, continued or completed.  Slutsky, 487 F.2d at 839.  To establish an "attempt to evade," however, the government must show that a defendant filed, prepared, signed, or mailed the tax return at issue in the Southern District of New York or engaged in some other affirmative act in the jurisdiction with a tax evasion motive.  United States v. Strawberry, 892 F. Supp. 519, 521 (S.D.N.Y. 1995) (applying the affirmative act analysis articulated in Spies v. United States, 317 U.S. 492, 63 S. Ct. 364 (1943)).

### B.  The Indictment Fails To Allege Proper Venue

The government has failed to establish venue for Counts Two through Forty.  As articulated at length by our codefendants, even after years of investigating defendants, the indictment fails to explain why this case has been brought before this Court.  The indictment does no better in explaining how venue is established as to the individual defendants Larson and Pfaff.  It alleges six overt acts involving defendant Larson and the three overt acts involving defendant Pfaff.  All but one of these acts occurred outside of New York.  More importantly, none of these acts appears logically related to any of the tax evasion counts or to meet the Spies affirmative act requirement.

Two of the overt acts alleged against defendant Larson relate to FLIP transactions, and so are clearly unrelated to the BLIP and SOS tax returns at issue in Counts Two through Forty.  For example, the indictment alleges that defendant Larson "signed an 'operating

agreement' regarding joint marketing and implementation of FLIP transactions" on behalf of the Larson/Pfaff entities, (¶ 78(d)), and that defendant Larson advised a FLIP client and his return preparer on January 30, 1997 to create a grantor trust "for the purposes of concealing on the client's tax return the FLIP tax loss to be generated and the client's gain from other sources," (¶ 78(a)).  There is no allegation of a connection to Counts Two through Forty.

Similarly, two other overt acts occurred approximately two years before the filing of any tax return at issue, had nothing to do with BLIPS or SOS, and accordingly have no clear relationship to the contested tax returns.  In paragraph 78(b), the indictment alleges that on July 18, 1997, defendant Robert Pfaff prepared a memorandum to other co-defendants "discussing how KPMG and the Larson/Pfaff Entities should jointly devise, market, and implement shelter transactions and how their fees should be divided." Id. at ¶ 78(b).  The indictment also alleges that an August 16, 1997 email to defendants Larson and Pfaff, among others, described a meeting "focusing on successfully completing Larson and Pfaff engagements, continuing to grow and expand the 'Tax Advantaged Transactions' practice that Larson and Pfaff had been overseeing, and endeavoring to forge an ongoing and successful relationship with the 'Pfaff/Larson firm.'" Id. at ¶ 78(c).  None of these allegations puts defendants Larson and Pfaff in New York, and since these acts do not have anything to do with the tax returns at issue, they do not constitute an affirmative act "to attempt to evade" those tax returns.

The same holds true for the allegations that by their terms relate to BLIPS.  The indictment alleges that defendant Larson and others met in Dallas, Texas for a BLIP task force meeting on or about April 30, 1999 and May 1, 1999. Id. at ¶ 78(m).  It is totally unclear, however, how a meeting in itself, without any further allegations constituting an attempt to evade, passes the Spies affirmative acts test, or how a meeting in Texas establishes venue in the Southern District of New York.

Finally, the indictment does allege acts by defendants Larson and Pfaff in New York.  Paragraph ¶ 78(u) alleges that defendant Pfaff met at one time and defendant Larson and others met at some other time in September or October 1999 with Domenick DeGiorgio at HVB offices in the Southern District of New York.  But that is all it alleges.  By itself, a meeting does

not satisfy the <u>Spies</u> affirmative acts test.  This allegation does not assert that defendants Larson or Pfaff did anything improper in this venue, and certainly not anything contributing to knowing and willful tax evasion.  The indictment simply does not say anything about these alleged meetings that indicates an attempt by defendants Larson and Pfaff to mislead or to conceal anything, let alone the tax evasion charges in Counts Two through Forty.

Finally, the remaining overt act involving defendant Larson alleges that on or about November 20, 2003, he provided false and misleading testimony under oath to a Senate Subcommittee.  <u>Id</u>. at ¶ 78(yy).  The indictment does not specify how this testimony, which was at least three years following the tax years at issue in Counts Two through Forty, constitutes an attempt to evade the tax due and owing on the tax returns at issue.  Moreover, the testimony is alleged to have occurred in Washington, D.C.

## C.  <u>Aiding and Abetting Charges Do Not Amount to Venue</u>

One must assume that the government hopes that it can satisfy its venue burden through an unarticulated web of affirmative acts by aiders and abettors, which at some point passes through the Southern District of New York, and ultimately leads to each tax return at issue.  While it is true that an individual accused of aiding and abetting a substantive crime may be prosecuted where the principal committed the substantive crime,  <u>Strawberry</u>, 892 F. Supp. at 526, the generalized allegations in the indictment fail to accomplish this objective.  Unlike in <u>United States v. Strawberry</u>, where "the indictment clearly charge[d]" the defendant with aiding and abetting the principal's tax evasion, the indictment here fails to provide facts sufficient to establish that venue for defendants Larson or Pfaff should be predicated on the actions of co-defendants.  892 F. Supp. at 526.

In the first instance, the indictment fails to identify the principals and aiders and abettors charged with each count, so that a proper venue analysis cannot be accomplished.  Further, the indictment fails to allege that any principal committed the substantive crime in the Southern District of New York with respect to each count.  <u>Id</u>.  The indictment vaguely states that all defendants committed or caused to be committed in the Southern District of New York

and elsewhere the following acts: "preparing and executing false and fraudulent documents to deceive the IRS," "creating entities to be used in executing tax shelter transactions," "executing financial transactions to implement the fraudulent tax shelter," "preparing and filing false and fraudulent tax returns," and "taking various steps to conceal from the IRS the existence of the shelters." Id. at ¶ 80. The government does not state who did these acts and where these acts occurred with respect to each count. Instead, what we are left with are many possible combinations -- 40 counts of tax evasion, nineteen defendants, 52 affirmative acts -- which may or may not satisfy the venue requirements for each substantive tax evasion count. This amount of uncertainty about a defendant's constitutional right to proper venue should not be left to speculation.

## III.   CONCLUSION

For the foregoing reasons, defendants John Larson and Robert Pfaff respectfully request that Counts Two through Forty be dismissed for failure to allege venue.

Dated:  January 12, 2006                          LATHAM & WATKINS, LLP


By:  ___/s/_____
        Steven M. Bauer (SB 6676)
        Karli E. Sager
        505 Montgomery Street
        San Francisco, CA 94111
        (415) 395-8083

        Attorneys for Defendant John Larson


Dated:  January 12, 2006                          OVERLAND BORENSTEIN SCHEPER
                                                   & KIM LLP


By:  ___/s/_____
        David C. Scheper (DCS 0072)
        300 South Grand Avenue
        Suite 2750
        Los Angeles, CA  90071
        (213) 613-4655

        Attorneys for Defendant Robert Pfaff

# TABLE OF CONTENTS

**Page**

MOTION FOR DISCLOSURE OF RULE 16 AND BRADY MATERIAL ...................................1

I.  INTRODUCTION ....................................................................................................1

II.  THE ALLEGATIONS AND FACTUAL CONTEXT .........................................................3

    A.  What The Government Must Prove In This Prosecution .....................................3

    B.  What The Defense Will Establish ......................................................................8

    C.  The Government Discovery Provided So Far........................................................8

III.  THE GOVERNMENT SHOULD BE ORDERED TO COMPLY WITH ITS DISCOVERY OBLIGATIONS ......................................................................9

    A.  The Government's Disclosure Obligations ..........................................................9

        1.  The Rule 16 Obligation to Disclose Evidence Material to the Defense ......................................................................................9

        2.  The Brady Obligation to Disclose Evidence Favorable to the Defense ...................................................................................10

    B.  Information Regarding Taxpayers and Investors ................................................11

        1.  Taxpayer and Investor Evidence Is Material to the Defense...................12

        2.  The Evidence Exists ...............................................................................15

    C.  Statements And Positions By IRS Professionals................................................17

        1.  Internal and External Statements by IRS Professionals Are Material........................................................................................17

        2.  The Evidence Exists ...............................................................................18

    D.  Statements and Positions By Others Involved In These Investments Or In Similar Investments........................................................................21

    E.  Privilege Logs And Statements Of Documents Withheld .................................22

IV.  CONCLUSION .....................................................................................................23

MOTION FOR BILL OF PARTICULARS .........................................................................25

I.  INTRODUCTION ..................................................................................................25

II.  THE COURT SHOULD ORDER THE GOVERNMENT TO RESPOND TO OUR REMAINING PARTICULARS ..............................................................25

    A.  Summary of Facts............................................................................................25

B.    A Bill of Particulars Is Appropriate.........................................................26

        1.    Defendants Have Met the Standard for A Bill of Particulars..................26

        2.    The Discovery Does Not Reveal the Requested Information..................28

III.    CONCLUSION ...................................................................................................29

MOTION TO DISMISS COUNTS TWO THROUGH FORTY FOR LACK OF VENUE.........................................................................................................................30

I.    INTRODUCTION ..............................................................................................30

II.    THE INDICTMENT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE VENUE ...............................................................................................30

    A.    Proper Venue Is A Constitutional Right.................................................30

    B.    The Indictment Fails To Allege Proper Venue......................................31

    C.    Aiding and Abetting Charges Do Not Amount to Venue.......................33

III.    CONCLUSION ...................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Apprendi v. New Jersey,
  530 U.S. 466, 120 S. Ct. 2348 (2000) ................................................................ 28

Blakely v. Washington,
  542 U.S. 296, 124 S. Ct. 2531 (2004) ............................................................ 27, 28

Boyetter v. Lefevre,
  246 F.3d 76 (2d Cir. 2001) .................................................................................. 10

Brady v. Maryland,
  373 U.S. 83 (1963), 83 S. Ct. 1194 ............................................................... passim

Cheek v. United States,
  498 U.S. 192 (1991), 111 S.Ct. 604 ..................................................................... 7

Coltec Industries, Inc. v. United States,
  62 Fed. Cl. 716 (2004) .......................................................................................... 4

Kyles v. Whitley,
  514 U.S. 419, 115 S. Ct. 1555 (1995) ................................................................. 11

Leka v. Portuondo,
  257 F.3d 89 (2d Cir. 2001) .................................................................................. 11

Long Term Capital Holdings v. United States,
  330 F. Supp. 2d 122 (D.Conn. 2004) ................................................................... 5

Spies v. United States,
  317 U.S. 492, 63 S. Ct. 364 (1943) ......................................................... 31, 32, 33

United States v. Agurs,
  427 U.S. 97, 96 S. Ct. 2392 (1976) ...................................................................... 10

United States v. Armstrong,
  517 U.S. 456 (1996), 116 S.Ct. 1480 .................................................................... 9

United States v. Beech-Nut Nutrition Corp.,
  871 F.2d 1181 (2d Cir. 1989) .............................................................................. 30

United States v. Bortnovsky,
  820 F.2d 572 (2d Cir. 1987) ........................................................................... 27, 28

United States v. Coppa,
  267 F.3d 132 (2d Cir. 2001) .......................................................................... 10, 11

United States v. Crosby,
  397 F.3d 103 (2d Cir. 2005) ................................................................................ 28

United States v. Dahlstrom,
  713 F.2d 1423 (9th Cir. 1983) .............................................................................. 7

United States v. George,
  786 F.Supp. 11 (D.D.C. 1991) ......................................................................... 9, 10

United States v. Giffen,
  379 F. Supp. 2d 337 (S.D.N.Y. 2004) ................................................................... 9

United States v. Gleason,
  265 F. Supp. 880 (S.D.N.Y. 1967) ...................................................................... 10

United States v. Harris,
    942 F.2d 1125 (7th Cir. 1991) ........................................................................... 7

United States v. Mallas,
    762 F.2d 361 (4th Cir. 1985) ............................................................................ 7

United States v. Pirro,
    212 F.3d 86 (2d Cir. 2000) ................................................................................ 7

United States v. Ramirez,
    420 F.3d 134 (2d Cir. 2005) ..................................................................... 30, 31

United States v. Rezaq,
    156 F.R.D. 514 (D.D.C. 1994) ......................................................................... 9

United States v. Rigas,
    258 F.Supp.2d 299 (2d Cir. 2003) ................................................................... 9

United States v. Saavedra,
    223 F.3d 85 (2d Cir. 2000) .............................................................................. 31

United States v. Santiago,
    46 F.3d 885 (9th Cir. 1995) ............................................................................ 11

United States v. Slutsky,
    487 F.2d 832 (2d Cir. 1973) ........................................................................... 31

United States v. Sternstein,
    596 F.2d 528 (2d Cir. 1979) ........................................................................... 14

United States v. Stevens,
    985 F.2d 1175 (2d Cir. 1993) ........................................................................... 9

United States v. Strawberry,
    892 F. Supp. 519 (S.D.N.Y. 1995) .......................................................... 31, 33

United States v. Sudikoff,
    36 F. Supp. 2d 1196 (C.D. Cal. 1999) ........................................................... 21

United States v. Taylor,
    707 F. Supp. 696 (S.D.N.Y. 1989) ................................................................ 27

United States v. Walker,
    922 F. Supp. 732 (N.D.N.Y. 1996) ................................................................ 27

United States v. Witt,
    U.S. Dist. LEXIS 14741 (S.D.N.Y. Sept. 13, 1982) .............................. 10, 15, 21

United States v. Wood,
    57 F.3d 733 (9th Cir. 1995) ..................................................................... 10, 11

**STATUTES**

18 U.S.C. § 3237(a) ............................................................................................ 31

26 U.S.C. § 7201 ................................................................................................. 31

I.R.C. § 1016(a)(5) ............................................................................................... 6

I.R.C. § 163 .......................................................................................................... 6

I.R.C. § 165(g) ..................................................................................................... 6

I.R.C. § 165(j) ...................................................................................................... 6

I.R.C. § 166 .......................................................................................................... 6

I.R.C. § 171 .......................................................................................................... 6

I.R.C. § 358(h) ........................................................................................................ 19

I.R.C. § 358(h)(3) ................................................................................................... 19

I.R.C. § 6111(c) ....................................................................................................... 4

I.R.C. § 6662 ........................................................................................................... 6

I.R.C. § 6664 ........................................................................................................... 6

I.R.C. § 7201 ........................................................................................................... 7

I.R.C. § 7206 ........................................................................................................... 7

I.R.C. § 7206(2) ................................................................................................. 7, 14

I.R.C. § 752(b) .................................................................................................. 18, 22

## OTHER AUTHORITIES

H.R. Rep. No. 108-548 (2004) ................................................................................ 5

I.R.S. Notice 2002-2 C.B. 757 ............................................................................. 20

I.R.S. Notice 2002-97 ........................................................................................... 20

Jasper L. Cummings, Jr., *The Range of Legal Tax Opinions, with Emphasis on the 'Should' Opinion*, Tax Notes, February 17, 2003 ...................................... 5

P.L. 106-554, § 309(c)(1) ...................................................................................... 19

P.L. 108-357, § 815(a) ............................................................................................ 4

Treasury's Enforcement Proposals for Abusive Tax Avoidance Transactions, 2002 TNT 55-28, March 20, 2002 ................................................................ 7

Willens, *IRS Challenging Tax Characterization of Seagram's Dupont Stock Redemption,* BNA Daily Tax Report No. 101 (May 27, 2003) .......................................... 22

## RULES

Fed. R. Crim. P. 16 ....................................................................................... passim

Fed. R. Crim. P. 16(a)(1)(E)(i) ............................................................................. 9

Fed. R. Crim. P. 18 .............................................................................................. 30

Fed. R. Evid. 702 ................................................................................................... 8

Fed. R. Evid. 703 ................................................................................................... 8

Fed. R. Evid. 705 ................................................................................................... 8

IRS Rule 30(b)(6) ........................................................................................... 15, 16

## REGULATIONS

Temp. Treas. Reg. § 1.752-6T ............................................................................. 19

Temp. Treas. Reg. § 1.752-6T(b)(2) .................................................................... 19

Treas. Reg. § 1.163-5(c)(2) ................................................................................... 6

Treas. Reg. § 1.279-3(d)(2) ................................................................................... 6

Treas. Reg. § 1.305-1(d) ........................................................................................ 6

Treas. Reg. § 1.305-3(d)(1) ................................................................................... 6

Treas. Reg. § 1.305-7(b)(1) ................................................................................... 6

Treas. Reg. § 1.355-6(c)(3) ................................................................................... 6

Treas. Reg. § 1.355-7(e) ........................................................................................ 6

Treas. Reg. § 1.356-3(c) ........................................................................................ 6

Treas. Reg. § 1.382-2T(h) ..................................................................................... 6

Treas. Reg. § 1.382-4(d) ........................................................................................ 6

Treas. Reg. § 1.421-1(a)(1) .................................................................................... 6

Treas. Reg. § 1.543-1(b)(5) .................................................................................... 6

Treas. Reg. § 1.6662-3(b)(3) .................................................................................. 5

Treas. Reg. § 1.6662-4(d)(2) .................................................................................. 5

Treas. Reg. § 1.671-4(b) ........................................................................................ 5

Treas. Reg. § 1.721-2(e) ........................................................................................ 6

Treas. Reg. § 1.988-1(a)(2)(iii) .............................................................................. 6

Treas. Reg. § 4.954-2(e)(5) .................................................................................... 6