UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ROBERT PFAFF,

                             Movant,


             -against-                                    12 Civ. 4995 (LAK)
                                                     (S1 05 Crim. 888 (LAK))


UNITED STATES OF AMERICA,

                             Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# MEMORANDUM OPINION


Appearances:

Robert Daniel Freisner
LAW OFFICES OF DANNY FREISNER

*Attorney for Movant Robert Pfaff*

Margaret Garnett
Assistant United State Attorney
Preet Bharara
UNITED STATES ATTORNEY

LEWIS A. KAPLAN, *District Judge*.

Robert Pfaff was convicted of twelve counts of tax evasion after a ten-week jury trial in what was commonly known as the KPMG tax shelter case. He was sentenced principally to 97 months imprisonment. The Second Circuit on August 27, 2010 affirmed his convictions.[1] He is serving his sentence.

Pfaff now moves to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 based on purportedly new information concerning David Amir Makov ("Makov"), a co-defendant and, ultimately, cooperating witness for the government. Makov's testimony appears to have played an important role in Pfaff's and John Larson's[2] convictions.

*Background*

Pfaff, Makov, and Larson at one time were partners in a tax shelter boutique called Presidio Advisors. Presidio was in the business of creating transactions that appeared to be legitimate, but were in fact unlawful devices designed to generate tax deductions. Pfaff, Makov, Larson, and sixteen others were indicted. The superseding indictment on which Pfaff and Larson were tried charges that the defendants conspired to create and implement four different fraudulent tax shelter vehicles – Foreign Leveraged Investment Program, Offshore Portfolio Investment Strategy, Bond Linked Issue Premium Structure, and Short Option Strategy – in violation of 18 U.S.C. § 371 and engaged in income tax evasion in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2.

Nearly two years after the superseding indictment was returned, Makov entered into

---

[1]

*United States v. Pfaff*, 407 F. App'x 506 (2d Cir. 2010), *cert denied sub nom. Larson v. United States*, 131 S. Ct. 3059 (Mem).

[2]

Larson too has submitted a motion for post-conviction relief. It is addressed in a separate order of even date.

a cooperation agreement with the government. Pursuant to that agreement, he pled guilty to one count of conspiracy to defraud the United States and agreed to forfeit $10 million out of the $17 million that he allegedly had amassed through the tax shelter conspiracy.[3] At the plea hearing, the government explained that, although the forfeiture amount was less than all of the proceeds, Makov had represented to it that $10 million "[wa]s substantially more than the assets that Mr. Makov [then] possesse[d]."[4]

Makov was a significant government witness at Pfaff's trial. Most relevant here, he testified that the plea agreement required him "to pay $10 million to the U.S. government, also restate [his] tax returns for the years 2000 through 2002 . . . . And forfeit a bunch of other assets to secure that $10 million."[5] When asked whether he had given the government all of his assets, he responded "[a]ll of my – all of my assets and any assets that are in trusts that I'm either beneficiary to or have any, you know, control over. I've handed it over to the government as collateral against my financial obligation to pay – make good on the conditions of the plea agreement."[6]

In Pfaff's opening brief on his Section 2255 motion, he argued that Makov secreted $4.8 million of his ill-gotten gains with his father, Mosho Makov, in 2002 and an additional $1 million in 2005.[7] He claimed that the government had been aware of these transactions and that

---

[3] Dec. 19, 2012 Garnett Decl. [DI 7], Ex. B.

[4] Sept. 10, 2007 Makov Plea Hr'g Tr. at 23:13-14, 22-23.

[5] Nov. 18, 2008 Trial Tr. at 3446:16-20.

[6] *Id.* at 3447:12-17.

[7] Makov transferred the $4.8 million from Morley, Inc., which Makov, Pfaff, and Larson owned and which existed to control certain Presidio entities, to Makov's father in 2002. The defendants ran the tax fraud conspiracy through Presidio. *See* Dec. 19, 2012 Gov. Br. [DI

Makov retained an interest in those funds when he entered into his plea agreement in 2007, yet failed to forfeit the $5.8 million. From this, he contended first that the government committed prosecutorial misconduct by allowing Makov to perjure himself when he testified that he had forfeited all of his assets to the government and, second, that its failure to turn over Makov's 2002 amended tax returns violated its obligation to disclose material impeachment evidence under *Giglio v. United States.*[8] Pfaff acknowledged, however, that he was aware of the $4.8 million transfer to Mosho Makov in advance of trial.[9] Finally, he argued that his trial and appellate counsel were ineffective and that he actually is innocent on certain counts.

The government responded that Pfaff procedurally defaulted on his prosecutorial misconduct/*Giglio* claims because he could have raised them at trial or on direct appeal. It submitted a declaration that stated that after Makov transferred the $4.8 million to his father, Mosho Makov placed the funds into the Palm Court Trust, the trustee of which was Rothschild Trust Guernsey.[10] The declaration stated that Makov "was neither the settler [*sic*] (or grantor) of the trust, nor its beneficiary, and had no ownership interest in the funds."[11] It further stated, however, that Mosho Makov unwound the trust in 2006 and gave Makov "the bulk of the balance," most of which was used to pay his legal fees.[12] The remainder was placed in Makov's Rothschild bank account, the existence

---

[6] at 3-4.

[8] 405 U.S. 150 (1972).

[9] Def. Mem. [DI 1] at 5, & Ex. 5.

[10] DI 7 ¶ 3.

[11] *Id.*

[12] *Id.*

and balance of which both had been disclosed to the defense before trial.[13] The declaration stated that the Assistant United States Attorneys prosecuting the case recalled that they had been satisfied after several proffer sessions with Makov that they "understood both the disposition of the approximately $17 million in fees that Makov had earned from Presidio and the nature and extent of his assets in 2007."[14] It further stated that Makov filed amended tax returns for the years 2000 and 2002.[15]

In response to the government's submission, Pfaff abandoned all of his Section 2255 claims with the exception of the questions "(a) whether the Government violated its obligations under *Giglio v. United States*, 405 U.S. 150 (1972); and (b) whether the Government's conduct in the case 'shocks the conscience' in the constitutional sense."[16] He concluded or assumed from the government's declaration that the transfer to Mosho Makov had been a gift by Makov. On that premise, he argued that Makov evaded the gift tax and did not file a gift tax return in violation of 26 U.S.C. §§ 7201 and 7203. To the extent that there was not a completed gift, he argues that Makov retained an interest in the Palm Court Trust and should have reported income from that foreign trust on his amended 2002 income tax returns and made related disclosures. The government, he asserts, therefore had been required to disclose this supposed ongoing tax fraud and the amended 2002 returns under *Giglio*.

---

[13]

      *Id.* ¶ 6; *see also id.* Ex. A.

[14]

      *Id.* ¶ 3.

[15]

      *Id.* ¶ 5.

[16]

      Apr. 1, 2013 Pfaff Br. [DI 18] at 2 n.1.

At the Court's request,[17] the government filed a sur-reply[18] with a second declaration.[19] This second declaration elaborates that Makov disclosed to the government in August 2007 that the 2002 $4.8 million transfer to his father had been a loan.[20] Upon repayment in 2006, Makov recorded $107,000 in interest on his income tax returns.[21] The declaration stated that recent discussions with Makov's counsel had revealed that Mosho Makov settled the Palm Court Trust, which had named "charitable beneficiaries," in February 2001.[22] Mosho Makov had provided the trustee with a non-binding "letter of wishes" that asked Rothschild to take into account Makov's wishes as to the trust's eventual beneficiaries. In December 2001, Makov provided his own "letter of wishes," which requested that the trustees "consider in their discretion" using any funds left in the trust for his children's benefit in the event of his death.[23]

The second declaration further states that Makov's amended 2002 tax return was prepared and filed by Elliott Kajan, a California tax attorney believed to be entirely independent.[24]

---

[17]

DI 20.

[18]

May 21, 2013 Gov. Br. [05 Cr. 888 DI 1546].

[19]

May 21, 2013 Garnett Decl. [05 Cr. 888 DI 1547].

[20]

*Id.* ¶ 4.

[21]

*Id.* ¶ 5.

[22]

*Id.* The December 2012 declaration stated that Makov's children were the Trust's beneficiaries. This discrepancy is not material to the Court's analysis of Pfaff's motion.

[23]

*Id.*

[24]

*Id.* ¶ 6.

The 2002 returns included an $8.4 million redemption from Morley, Inc. as a capital gain, which the government believes to have included the $4.8 million transferred.[25]

Pfaff filed a third brief in response to the government's sur-reply.[26]

*Discussion*

Pfaff claims that the government committed *Giglio* violations by withholding facts related to the $4.8 million transfer, the 2006 unwinding of the trust, and Makov's 2002 amended tax returns and that its conduct "shocks the conscience." He argues that Makov (1) misled the Court by failing to disclose the $4.8 million receivable (assuming that the transfer was a loan)[27] on his bail disclosures and (2) committed ongoing tax fraud by failing to disclose his alleged interest in the Palm Court Trust on his 2002 amended tax return. He claims that the government was guilty of misconduct by (1) misleading the Court at Makov's plea hearing when it indicated that the $10 million forfeiture exceeded Makov's assets at that time, (2) allowing Makov to retain proceeds of his criminal activities, (3) suborning perjury in eliciting testimony from Makov that he had pledged all of the assets under his control to satisfy his forfeiture obligations, and (4) allowing Makov to testify that he had filed accurate amended 2002 tax returns.[28]

---

[25]

*Id.* ¶ 3.

[26]

June 20, 2013 Reply Br. [DI 25].

[27]

Pfaff disputes that the transaction was a loan.

[28]

Pfaff cites no cases in support of his argument that the government's conduct shocks the conscience. In addition, the accusation that the government suborned perjury notwithstanding, footnote 1 in Pfaff's April 1, 2013 reply brief [DI 18] demonstrates that he abandoned the claim that Makov's alleged perjury warrants a new trial.

The government rejoins that Pfaff's claims are barred procedurally and based on factual assumptions and speculation. It contends that Pfaff's counsel was aware at all times of facts adequate to question Makov about his personal finances and that the decision not to do so was a presumptively valid strategic choice that Pfaff cannot challenge successfully in a collateral attack.

I.    *Legal Standard*

*Brady v. Maryland*[29] requires the government to disclose "evidence [that] is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[30] In *Giglio v. United States*,[31] the Supreme Court extended this rule to material impeachment evidence.[32] The Second Circuit in *United States v. Coppa*[33] subsequently laid out a three-part test that criminal defendants must satisfy in order to prove a violation under *Giglio*. They must show that "(1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice."[34]

Where, as here, a movant has not raised the issue that forms the basis for requested

---

[29]    373 U.S. 83 (1963).

[30]    *Id.* at 87.

[31]    405 U.S. 150 (1972).

[32]    *Id.* at 153-54.

[33]    267 F.3d 132 (2d Cir. 2001).

[34]    *Id.* at 140.

    It is not disputed that the evidence would have been favorable to Pfaff. Thus, that prong is not evaluated below.

habeas relief on direct review, he must show also "cause" for that failure and that prejudice would result if he were not permitted to pursue the argument by a Section 2255 motion.[35] For the purposes of the analysis here, the "cause" element of the waiver test and the first prong of the *Coppa* test are identical, as are the "prejudice" prongs.[36]

To satisfy both *Coppa*'s first prong and the "cause" requirement, a defendant must demonstrate that the government suppressed evidence. The government's disclosure obligation, however, does not require that it make out a defendant's case for it. Rather, the government's disclosure obligations are satisfied where a defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence."[37] Disclosures that "give[] the defendant a reasonable opportunity either to use the evidence in the trial or to use the information to obtain evidence for use in the trial" are sufficient.[38]

To satisfy the prejudice prong, a defendant must demonstrate "a reasonable probability that the suppressed evidence would have produced a different verdict"[39] or, in other words, that the

---

[35]

*United States v. Frady*, 456 U.S. 152, 167-68 (1982); *Hickman v. Nash*, 8 F. App'x 59, 60 (2d Cir. 2001).

[36]

*See Banks v. Dretke*, 540 U.S. 668, 691 (2004) ("Corresponding to the [first] Brady component (evidence suppressed by the State), a petitioner shows "cause" when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence; coincident with the third Brady component (prejudice), prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brady* purposes.").

[37]

*United States v. Gaggi*, 811 F.2d 47, 59 (2d Cir. 1987).

[38]

*United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007).

[39]

*Strickler v. Greene*, 527 U.S. 263, 281 (1999).

evidence is material.[40] Impeachment evidence generally is found material "where the witness at issue supplied the only evidence linking the defendant(s) to the crime . . . or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case."[41] And "where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or is subject to extensive attack by reason of other evidence, the undisclosed evidence may properly be viewed as cumulative, and hence not material, and not worthy of a new trial."[42]

Although the information that Pfaff alleges the government suppressed – the nature of the 2002 transfer, the 2002 amended tax return, and the unwinding of the Palm Court Trust – are all bound up in the same transaction, the non-disclosure of each piece could constitute its own *Giglio* violation. Accordingly, the Court considers each individually and in relation to the others.

## II.     *Alleged Suppression of Evidence*

### A.     *The 2002 Transfer*

#### i.     *The Government Satisfied its Disclosure Obligation*

Pfaff now argues that the government improperly suppressed the fact that Makov had an ongoing interest in the $4.8 million that he transferred to his father in 2002 and, moreover, that he failed to pay gift taxes or foreign trust taxes (depending on the nature of the transfer) on or

---

[40]      *See Carter v. Ercole*, 338 F. App'x 43, 44 (2d Cir. 2009) (citing *Cone v. Bell*, 556 U.S. 449, 469-70 (2009)).

[41]      *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995) (internal quotations and citations omitted).

[42]      *United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011).

otherwise disclose that interest. This argument is best taken in the full context of the case, beginning with Makov's 2005 bail hearing.

During the bail proceeding, there was considerable discussion about the status of Makov's $17 million in illegally obtained proceeds. In working through the figures, the Court identified an approximately $4.5-$5.5 million hole. The defense brushed this aside, cursorily explaining "Your Honor, he did pay taxes, he does have liabilities. You see that he has some guarantees that he has posted in Israel. . . . He also invested in some Lucent Technology stock, and he lost on that, and several other things."[43]

In light of the foregoing, Pfaff was on notice beginning in 2005 that some of Makov's proceeds from the tax shelter had not clearly been accounted for. Furthermore, it is undisputed that the government disclosed to Pfaff the fact of the transfer in advance of trial.[44] Thus, facts permitting Pfaff to explore the nature of the $4.8 million transfer, whether Makov still retained an interest in that money, and whether the $10 million forfeiture included in the plea agreement had allowed Makov to retain a portion of the ill-gotten gains were readily available to him at trial.[45]

Pfaff relies on three cases in support of his argument that the government was required to disclose more than the fact of the transfer. First, he cites *United States v. Rodriguez*,[46] in which the Second Circuit held that where the defendant knew that a witness had told lies but the government

---

[43]

Nov. 8, 2005 Bail Hr'g Tr. at 12:24-13:7.

[44]

05 Cr. 888 DI 1546 at 3; DI 1 at 5 & Ex. 5.

[45]

The government's second declaration admits that the government learned in August 2007 that the 2002 transfer was a loan, a fact it evidently did not disclose before trial.

[46]

496 F.3d 221 (2d Cir. 2007).

refused, upon request, to disclose the nature of those lies, the government may have committed a *Giglio* violation.[47] It noted that "leaving it for defense counsel to find out what the lies were by questioning the witness before the jury, might as a practical matter foreclose effective use of the impeaching or exculpatory information."[48]

      *Rodriguez* is of little assistance to Pfaff. Pfaff knew of the $4.8 million related party transfer in advance of trial and that approximately $5 million of the $17 million that Makov earned illegally had not been accounted for clearly. He could have explored the nature of the transfer, which was inherently suspect by virtue of its related party nature, and then made the arguments that he makes now. Indeed, Pfaff argued in his opening brief – before receiving any additional information from the government regarding the nature of the transaction – that the government violated *Giglio* by failing to disclose Pfaff's alleged ongoing interest in the funds. The basis for believing that Makov may have had an ongoing interest in the funds has shifted based on the details contained in the government's affidavits, but the core claim remains the same. The fact that Pfaff was able to make this argument in his opening Section 2255 brief thus makes clear that he knew enough to have used this point at trial for whatever value it may have had.

      Pfaff next cites *Leka v. Portuondo*,[49] which is equally distinguishable. The Second Circuit there held that the government disclosed "too little, too late" when it offered the name of a

---

[47]

    *Id.* at 227-28.

    The court remanded to the district court for a determination of whether the specific lies, which were not disclosed in the appellate record, were material.

[48]

    *Id.* at 227.

[49]

    257 F.3d 89 (2d Cir. 2001).

key eyewitness who possessed potentially exculpatory information – but not any information regarding what he saw – only nine days before the start of trial.[50] However, it is evident from the court's reasoning that the confluence of the minimal and late disclosure yielded the violation. There is no indication in *Leka* that disclosing the witness's name alone would have been problematic if the disclosure had been made months in advance of trial. To the contrary, the Second Circuit has held that the government did not commit a *Brady* violation where the defense knew the name of a grand jury witness, but the government did not turn over that witness's testimony.[51] Here, Pfaff does not argue that he had inadequate time to investigate or prepare for cross-examination; he argues only that the disclosure was insufficient in scope.

Finally, Pfaff cites *Banks v. Dretke*,[52] in which the Supreme Court reversed the Fifth Circuit on the question of whether a habeas petitioner had procedurally defaulted on his *Brady* claim. Banks was convicted at trial of capital murder and sentenced to death.[53] In the run-up to trial, the state had represented to Banks that it would provide him with any and all exculpatory evidence.[54] Despite this representation, the state did not disclose that two of its key witnesses – Farr and Cook – were, respectively, a paid police informant and coached by the police and prosecution.[55]

---

[50] *Id.* at 100-01.

[51] *United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982); *see also United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988).

[52] 540 U.S. 668 (2004).

[53] *Id.* at 674.

[54] *Id.* at 674-75.

[55] *Id.* at 675.

Banks filed a state post-conviction motion some years later in which he alleged, based on third-party information, that Farr had been a police informant and that Cook had received a generous deal from the prosecution.[56] The state denied Banks's factual allegations, insisting that it had fulfilled its disclosure obligation under *Brady*.[57] Banks took no further action, and the state court rejected his claim.[58]

After exhausting his state remedies, Banks filed a petition for a writ of habeas corpus in the district court, reasserting his claim that the state had suppressed evidence that it was connected to the two key witnesses.[59] Through discovery, Banks uncovered additional factual bases for his claim that the state had suppressed the fact that Farr was a paid police informant and he learned that the state had coached Cook's testimony.[60] The district court granted the writ as to Banks's death sentence based on the undisclosed evidence of Farr's informant status.[61] The Fifth Circuit reversed, holding in part that Banks had not demonstrated cause for his failure to develop his *Brady* claim during the state habeas proceeding.[62] The Supreme Court then granted *certiorari* and reversed.

The Court held that Banks had demonstrated cause for failing to present evidence in

---

[56]

    *Id.* at 682-83.

[57]

    *Id.* at 683.

[58]

    *Id.*

[59]

    *Id.* at 683-84.

[60]

    *Id.* at 685-86.

[61]

    *Id.* at 686-87. The court held that Banks, for procedural reasons not relevant here, had failed to plead a *Brady* claim as to the evidence related to Cook.

[62]

    *Id.* at 687-88.

support of his claim during the state habeas proceedings.[63] Banks's failure to investigate his claim, the Court held, had been justified. It reasoned that Banks had not erred in relying on the state's representation at the trial stage that it had disclosed all *Brady* material under an open-file discovery policy.[64] Moreover, the state denied Banks's factual assertions at the state habeas proceeding, "thereby 'confirm[ing]' Banks's reliance on the prosecution's representation that it had fully disclosed all relevant information its file contained."[65] The Court determined that "[a] rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."[66]

       *Banks* rightly cautions that the government must not be too illiberal in disclosing pertinent information. But the situation in *Banks* is not sufficiently analogous to this case to justify the relief that Pfaff seeks. The *Banks* Court did not hold that the government is required to engage in open-file discovery or to make defendants' cases for them. It remains the law that a defendant who "knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence" cannot prevail on a claim of a *Brady*/*Giglio* violation.[67] In *Banks*, the defendant independently learned from a third party that the two witnesses may have had ties to the police. He was stymied, however, by the state's persistent claim that it had disclosed all *Brady* material. The

---

[63] *Id.* at 698.

[64] *Id.* at 693.

[65] *Id.*

[66] *Id.* at 696.

[67] *Gaggi*, 811 F.2d at 59.

government actively lied in order to conceal the truth.

Pfaff knew far more at trial than Banks knew when he was pursuing his state habeas claim. Pfaff knew from court proceedings and evidence disclosed to him that the Court had uncovered a poorly explained $4.5-$5.5 million hole in Makov's financial disclosures and that Makov had transferred $4.8 million to his father in 2002. By contrast, Banks knew only what a third-party had told him and that the state had denied the truth of that statement. Moreover, Pfaff's access to this information in advance of trial permitted him to investigate further, cross-examine and impeach Makov on the stand, or raise a *Giglio* claim.

### ii. *Pfaff Has Not Established Prejudice*

Even if Pfaff were correct on his suppression argument, he would not prevail. There is no reasonable probability that the outcome of the trial would have been different if the government had disclosed Makov's alleged retained interest in the $4.8 million.[68]

Pfaff asserts that he could have used that information to impeach Makov based on his failure to pay taxes on or otherwise report his ongoing interest in the foreign trust and, if the transfer was a loan, that he dishonestly failed to disclose the receivable on his bail application. But this argument his quite unpersuasive.

Where previously undisclosed impeachment evidence is cumulative of existing impeachment evidence, a claim of prejudice should fail.[69] Makov was cross-examined for two full

---

[68] *See Strickler*, 527 U.S. at 281. This is regardless of whether the transfer was a gift, in which case Pfaff argues that Makov was required to pay a gift tax, or a loan, in which case Pfaff argues that Makov was required to pay income interest on the Trust. In any event, this alleged interest was extinguished in 2006 when Mosho Makov repaid the bulk of the funds.

[69] *See Persico*, 645 F.3d at 111.

days during which he admitted to having committed perjury during a 2005 deposition related to the actions charged in the criminal case.[70] He did not begin cooperating with the government until 2007. Lies he may have told before entering into the cooperation agreement are consistent with his apparent goals pre-2007 of amassing illegally obtained funds and avoiding prosecution. Thus, it is not reasonably probable that additional impeachment based on his failure to disclose that the $4.8 million transfer was a loan or to disclose the receivable as an asset on his bail financials in 2005, assuming the transaction in fact was a loan, and any potential access to those funds that he had through 2006 would have altered the outcome of the trial.

   B.   *The 2002 Amended Tax Return*

Pfaff next argues that Makov's 2002 amended tax return must contain fraudulent misstatements and that the government violated its *Giglio* obligation in failing to produce it. This claim springs also from the $4.8 million transfer from Makov to his father and the related tax and disclosure obligations that Pfaff argues Makov incurred. Makov's failure to satisfy these tax payment and reporting obligations, Pfaff contends, was an ongoing tax fraud committed while Makov was

---

[70]     DI 1546 at 11-12; Nov. 18, 2008 Trial Tr. at 3409:18-24 ("Q. What was your purpose, you personally, in agreeing to give the deposition? A. My purpose was to mislead and lie during the deposition, such that it will shed a positive light on BLIPS, that that deposition could be used in a court in California to win the case of BLIPS, to shed a positive light on BLIPS. And to do so I intended to be misleading and to lie."); *id.* at 3410:25-3411:10 ("Q. Did you lie? A. Yes. Q. Why? A. I lied for two reasons. Reason number one, hoping that, you know, my lies would help in the case. And, therefore, there will be no criminal indictment for myself and for John and Bob. And the second, because I viewed that the risk of me lying under oath in Israel to a court in the United States, I viewed that to be a very small risk, because I had no intention of ever showing up in the U.S. at that point.").

cooperating with the government.[71]

This claim lacks merit. Pfaff has put forth several theories as to why Makov would have had tax obligations connected to the 2002 transfer. He has not given the Court any reason to believe, however, that the 2002 amended return does not contain appropriate disclosures and provide for appropriate payment under the Internal Revenue Code. To the contrary, Elliott Kajan, a respected tax attorney with no known prior connection to Makov, prepared Makov's 2002 amended return. Thus, Makov either lied to Kajan about the nature of the transfer in order to avoid incurring tax obligations, or Kajan aided him in his fraud. Pfaff has put forth no reason to believe that Kajan would have aided Makov in committing tax fraud, and if one is to believe that Makov lied to Kajan, it would be equally probable that he would have passed the same lie off on the government.[72]

C.    *The Returned Funds*

Finally, Pfaff argues that the government violated its *Giglio* obligation in failing to disclose that Mosho Makov returned a portion of the $4.8 million to Makov in 2006, that the government allowed Makov to keep some of that money, and that it allowed Makov to perjure

---

[71]    Makov's September 2007 plea agreement required him to amend his 2002 tax returns. *See* DI 7, Ex. B.

[72]    Pfaff has not demonstrated the he is entitled to discovery of the 2002 amended return. For the reasons stated regarding his substantive *Giglio* claim, he has not put forth adequately specific factual allegations that, if developed, would entitle him to relief.  *See* 28 U.S.C. § 2255, Rule 6; *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) ("[W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.").

himself when he testified that he had forfeited all of his assets under the plea agreement.[73] This argument is not persuasive.

Pfaff knew from Makov's bail disclosures that Makov had $230,000 in his Rothschild bank account in 2005 and he knew from the government's *Jencks* material that Makov had $2.5 million in the account by 2007. He knew also that Makov was a defendant in this complicated and expensive case from 2005 and that he was represented by privately retained counsel.

Pfaff's contention that the government was required to disclose more than this is not correct. Although "the government has a duty to be forthcoming with favorable evidence, it is not required to draw inferences from that evidence which defense counsel is in an equal position to draw."[74] Facts permitting Pfaff to inquire as to the financing of the defense and the approximate $2 million increase in Makov's Rothschild account were available to Pfaff in advance of trial. Indeed, with the 2005 and 2007 Rothschild balances before him, Pfaff was fully equipped to inquire with respect to the source of the approximately $2 million or more that materialized between 2005 and 2007.

Pfaff's own materiality argument further suggests that he could have raised this claim at an earlier stage. His theory of materiality in part rests on the argument that the government, in requiring the $10 million forfeiture, improperly allowed Makov to retain a portion of his ill-gotten gains. This is an argument that Pfaff clearly could have made at trial based on the information then available to him. It is apparent that he had access at trial to the transcript of Makov's plea hearing and Makov's plea agreement. Pfaff could have measured the forfeiture amount against Makov's August

---

[73] Of the returned funds, a portion went to pay Makov's legal fees and approximately $2 million was deposited into his Rothschild bank account. *See* DI 6 at 14.

[74] *Gaggi*, 811 F.2d at 59.

2007 financial disclosure to the government and cross-examined him on that basis. Pfaff chose not to take advantage of that information and cannot argue now what it plainly could have argued before.

Moreover, the government never represented to the Court that it independently had scoured Makov's financials to ensure that it had captured all appropriate funds. It explained that the $10 million figure was based on Makov's own financial representations.[75] This is unlike *Banks*, where the petitioner relied on the state's own assurances and thus failed to pursue his claim.

*Conclusion*

For the foregoing reasons, Pfaff's Section 2255 motion [DI 1] and motion for discovery [DI 19] are denied in all respects. A certificate of appealability is granted solely with respect to the question of *Banks v. Dretke*'s application to the facts of this case and is denied in all other respects. Any appeal herefrom with respect to any other issue would not be taken in good faith within the meaning of 28 U.S.C. § 1915(a)(3).

SO ORDERED.

Dated:        November 21, 2013

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[75]     Sept. 10, 2007 Makov Plea Hr'g Tr. at 23:22-24:7.